IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DIAMOND KENNEDY**<br>8449 Bates Drive<br>Bowie, MD 20720<br><br>                      **Plaintiff,**<br><br>                v.<br><br>**DYNAMIC-PRO INC.**<br>c/o Andrea Stone<br>7435 Mason Lane<br>Falls Church, VA 22042<br>                      **Defendant.** | )<br>)<br>)<br>)<br>)<br>) **Civil Action No. 1:19-cv-2212**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT

Plaintiff Diamond Kennedy, by and through her undersigned counsel, brings this civil action against Defendant, Dynamic-Pro Inc and complains of the Defendant as follows:

## NATURE OF THE ACTION

1. Diamond Kennedy brings this action against her former employer, Dynamic-Pro, Inc. for violating her rights under the D.C. Human Rights Act, D.C. Code § 2-1401.01 *et seq.*, and the Protecting Pregnant Workers Fairness Act, D.C. Code § 32-1231.01 *et seq.* for failing to accommodate her pregnancy related disability, retaliation and for unlawfully terminating her from the position she held with Defendant's client, the Federal Railroad Association of the Department of Transportation.  After Plaintiff requested an accommodation for her pregnancy related disability and complained to Defendant that she was being subjected to sexual harassment, retaliation and a hostile work environment at the Federal Railroad Association, she was immediately placed on a Performance Improvement Plan and unlawfully terminated 30 days thereafter.

## PARTIES

2.     Diamond Kennedy (hereinafter, "Plaintiff" or "Ms. Kennedy") is a female resident of the State of Maryland.  Plaintiff was formerly employed by Dynamic-Pro Inc. until her unlawful termination in or around October 1, 2018.   From September 2017 until October 1, 2018, and at all times relevant to this action, Plaintiff was assigned by Dynamic Pro, Inc. to work as an administrative specialist at the Federal Railroad Administration ("FRA") of the Department of Transportation ("DOT").

3.     Defendant Dynamic-Pro, Inc.  (hereinafter, "DPI" or Defendant) is a private employer and/or employment agency headquartered in Falls Church, Virginia.  Defendant's registered agent is listed as Andrea Stone, who is also DPI's Chief Executive Officer.Defendant is a government contracting/staffing company that places employees at various client sites, including federal agencies.  Defendant employed Plaintiff and placed her at the FRA in the District of Columbia from September 2017 until it unlawfully terminated her on or about October 1, 2018.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction to adjudicate the claims asserted in this Complaint pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000.00, and the parties are citizens of different states.

5.     Venue is proper in the United States District Court for the District of Columbia pursuant to 28 U.S.C. § 1391, because all, or a substantial part, of the events or omissions giving rise to this Complaint occurred in this District.

## STATEMENT OF FACTS

6.     Plaintiff was hired by Defendant DPI to serve as a contractor for the federal government.  During her employment at DPI, Ms. Kennedy's reported to Michael Perez, Business Operations Director of DPI.  At all times relevant to the allegations in this Complaint, Mr. Perez

was Defendants' agent.  In his LinkedIn profile, Mr. Perez boasts that he is an "Ambitious Business Executive [sic]" who has enjoyed success driving "client relationship management" and is "[a]dept at cultivating high-performance teams, ensuring superior customer satisfaction…"  As discussed herein, DPI and Mr. Perez ensured "superior customer satisfaction" by terminating Ms. Kennedy after she asked for an accommodation for her disability and complained to Defendant that she was being harassed and targeted by two supervisors at Defendant's client, the FRA..

7.  When Ms. Kennedy began working at the FRA in September of 2017, she initially reported to the Acting Administrator for the FRA, Patrick Warren.

8.  During her first week of employment, Ms. Kennedy was approached by two of her new colleagues, Ashanti Jordan and Perrin Bradley.  They warned Ms. Kennedy about Marc Willis, the FRA's Public Relations Supervisor.  They described Mr. Willis, who is married, as a known "predator" and told Ms. Kennedy that Mr. Willis was "really going to like her" because she was his "type."  They also informed Ms. Kennedy that she should expect Mr. Willis to "hit on" her.

9.  Their warnings came true because shortly after Ms. Kennedy first learned about Willis, he began his inappropriate and unlawful conduct by openly ogling Ms. Kennedy with a particular focus on her posterior whenever she walked by.  He would laugh and shake his head in apparent enjoyment of her appearance.  He asked Ms. Jordan if Ms. Kennedy was a stripper based on the shape of her body.

10.  Notwithstanding Willis's inappropriate behavior, Ms. Kennedy thrived in her new role, which did not go unnoticed.  In November of 2017, Perez, Plaintiff's supervisor at DPI, asked Ms. Kennedy to transfer into a new position because someone had specifically requested that she be assigned to work for him based on her performance and work ethic.  At first, Plaintiff was reluctant because she thought that this position would be as an assistant to Willis.  She was under this incorrect impression because Mr. Willis had told her on several occasions that he would ensure that

3

Ms. Kennedy would replace his current executive assistant. After she learned that the position entailed working directly for Christopher Hess, the FRA's Government Relations Manager, she immediately agreed.

11. Although she would not be reporting to Mr. Willis, Plaintiff's new position put her in closer proximity to him because they now worked in the same office suite along with Mr. Hess and Antoinette Jensen, who was Mr. Willis's assistant.

12. After her reassignment, Mr. Willis continued his sexual harassment of Ms. Kennedy. Between November 2017 and July 2018, Willis sexually harassed and subjected Plaintiff to a hostile work environment based on her gender. His conduct included, but is not limited to:

   a. Telling Plaintiff that she was pretty and that if he was younger, he would date her.

   b. While Ms. Kennedy was chewing gum, Mr. Willis asked for a piece of gum and stated he needed a piece as well because he didn't know when she would ask for a kiss from him.

   c. On Fridays, the DOT permitted workers to wear jeans. When she wore jeans on Fridays, Mr. Willis would often make inappropriate sexually charged comments regarding her appearance. He told her that he really liked the way she looked in them.

   d. Ms. Kennedy was printing a large print project and Mr. Willis walked over and asked her to get in front of her to print. She jokingly said "it will cost you" in a non-sexual manner. Mr. Willis then replied, "I'm willing to pay for certain things." It was clear that Mr. Willis's statement was intended to be a sexual innuendo and it made Ms. Kennedy visibly uncomfortable.

   e. Ms. Kennedy came into work late because she was ill. She happened to have red splotches on her neck. Mr. Willis said, "I know why you were late today" and Ms.

4

Kennedy said, "it's because I was sick." Mr. Willis told her, "No it's not because you were sick, it's because of those red marks on your neck, I'm really jealous of how you got those red marks on your neck."

13. Ms. Kennedy became so uncomfortable with Willis's inappropriate behavior, she did whatever she could to avoid him in the office. Ms. Kennedy was afraid to report Mr. Willis's behavior to the DOT and/or Defendant because Willis regularly threatened Plaintiff that she was s contractor and could be terminated at any time, implying that he had the power to terminate her by complaining about her to DPI.

14. On or about July 16, 2018, Ms. Kennedy arrived to work and discovered that she had been reassigned by Defendant to work for the Chief Financial Officer of the FRA, Rebecca Pennington.

15. As part of her reassignment, Ms. Kennedy was required to report to a new Contracting Officer Representative ("COR") named Yulita O'Neal. Ms. O'Neal worked in the CFO's office and was close friends with Mr. Willis.

16. Around the time of her reassignment, Ms. Kennedy confided in Antoinette Jensen (Willis's assistant) about Mr. Willis's sexual harassment and threatening behavior. Ms. Jensen encouraged Ms. Kennedy to report his behavior to the DOT's Equal Employment Office ("EEO"). Ms. Kennedy was afraid of losing her job but with Ms. Jensen's support, she felt that she could file a complaint. Plaintiff also felt safe enough to file a complaint because she was working in a new department, away from Mr. Willis and his influence, or so she thought.

17. On July 24, 2018, Ms. Kennedy went to the EEO to file a sexual harassment complaint against Mr. Willis. Ms. Jensen accompanied her.

18. At the EEO office, Ms. Kennedy met with the EEO Program Manager, Shandra Whiting. Ms. Whiting told Plaintiff that she would speak with Mr. Willis about the inappropriate

behavior, but she would keep Ms. Kennedy's identity confidential. In other words, Ms. Whiting assured Plaintiff that she would remain anonymous.

19. Upon information and belief, after Ms. Whiting spoke to Mr. Willis, Plaintiff noticed a significant change in Willis's attitude toward Plaintiff. Mr. Willis became withdrawn and went out of his way to avoid interacting with her even with respect to work-related issues. A few days later, her suspicion was confirmed because Ms. Whiting told Ms. Kennedy that Mr. Willis knew Ms. Kennedy was the source of the complaint against him.

20. Prior to Ms. Kennedy complaining about Mr. Willis to the EEO, she had a good working relationship with her new COR, Ms. O'Neal. However, after Ms. Kennedy went to the EEO, this positive relationship turned negative based on Ms. O'Neal close relationship with Mr. Willis. As a result of her complaint, which constituted protective activity, Ms. O'Neal subjected Ms. Kennedy to discrimination, harassment and retaliation.

21. O'Neal's harassment, discrimination and retaliation took the form of unjustified criticism of Ms. Kennedy's work performance, sabotage and, in conjunction with Defendant DPI, refusing to accommodate Ms. Kennedy's pregnancy related disability. These acts of harassment, discrimination and retaliation included, but are not limited to:

  a. Ms. O'Neal and Mr. Willis would, on numerous occasions, walk by Ms. Kennedy in the hall and laugh out loud in an overly boisterous manner to create a hostile work environment and to signal to Ms. Kennedy that her complaints were laughable and that the two of them were above reproach.

  b. Ms. O'Neal criticized Ms. Kennedy for trivial issues, like, for example, not responding "ok" to calendar updates. O'Neal reported this allege issue to Defendant even after Ms. Kennedy began responding "ok" to all of Ms. O'Neal's calendar invites.

c. Ms. O'Neal also would repeatedly criticize Ms. Kennedy for how she positioned her computer screen. When Ms. Kennedy would step away from her desk, O'Neal would move her screen in order to harass her as there was no business justification for having her screen positioned one way or the other.

d. Ms. Kennedy became pregnant in the Spring of 2018 and informed Ms. O'Neal of her pregnancy when she was transferred to work for the CFO. Ms. Kennedy suffered from a pregnancy related disability called hyperemesis gravidarum, which is a severe type of morning sickness. Ms. Kennedy would experience sever bouts of nausea, vomiting and dizziness which caused to her to take a take longer time than normal for bathroom breaks. Ms. O'Neal was aware of Ms. Kennedy's disability, yet she complained to Defendant and others about Ms. Kennedy spending too much time in the bathroom and being away from her desk.

e. Ms. O'Neal complained and refused to grant Ms. Kennedy's requests for training on a software program called PRISM, which Ms. Kennedy was required to be familiar with as part of her new position. This affected here ability to do her job effectively.

f. Ms. O'Neal would criticize Ms. Kennedy for failing to complete assignments in a timely manner without giving Ms. Kennedy any deadlines for said assignments.

g. Ms. O'Neal intentionally set up Ms. Kennedy in order to make her look incompetent. For example, O'Neal instructed Ms. Kennedy to speak with department employees and inquire if any of them wanted calendars ordered. Ms. Kennedy compiled the information and provided the number and type of calendars requested to Ms. O'Neal. Ms. O'Neal told Ms. Kennedy to set up the purchase on her computer and that she would bring the credit card over when Ms. Kennedy was ready to make the transaction. Ms. Kennedy put everything in the online shopping cart and called Ms. O'Neal over to bring the credit

7

        card.  Before Ms. Kennedy made the purchase, Ms. O'Neal told her to add some additional calendars to the order.  This put the bill above what had previously been approved by the funds administrator.  Because Ms. Kennedy made the purchase, it appeared that she had exceeded the approved amount, even though she was just following O'Neal's instructions.  Ms. O'Neal blamed the excessive order on the Plaintiff.

    h.  On August 28, 2018, Chris Hess called Ms. Kennedy into his office and asked her to make a binder for the FRA Administrator to take to Capitol Hill.  Mr. Willis was in or around Hess's office and heard the conversation.  Following the exchange, Mr. Willis went to Ms. O'Neal and told her that Plaintiff had been scheduling travel for Hess, which she was allegedly not permitted to do under the contract with DPI.  Ms. O'Neil reported this to Defendant and Defendant issued Plaintiff a reprimand, as discussed in further detail below.

22.     Prior to engaging in protected activity, Ms. Kennedy had enjoyed positive reviews and accolades for her work performance.  Now it was clear that Ms. O'Neal was retaliating against her for complaining to the EEO regarding Mr. Willis.  Ms. O'Neal wanted Plaintiff fired and/or she wanted to create a hostile environment that would cause Plaintiff to resign.

23.     Defendant's agent, Mr. Perez, met with Plaintiff on July 24, August 20, and August 30, 2018 to discuss Ms. O'Neal's criticisms of Plaintiff.  At the August 30, 2018 meeting to discuss the binder/scheduling travel incident with Hess, Ms. Kennedy explained that the accusations by O'Neal were demonstrably false.  Plaintiff presented Mr. Perez with an email from Mr. Hess which disproved the false claim that Plaintiff was helping to arrange Mr. Hess's travel.  Plaintiff also told Perez about the sexual harassment from Mr. Willis, her complaint about Willis to the EEO, and all the retaliation she was experiencing from Ms. O'Neal because of her protected activity.  Finally,

during this meeting, Ms. Kennedy requested to be transferred to a new position away from Willis and O'Neal.

24. Incredibly, even though Perez acknowledged that Ms. O'Neal had lied about Ms. Kennedy scheduling travel and was now aware that Plaintiff had gone to the EEO, Mr. Perez informed Plaintiff that Ms. O'Neal's conduct was not sufficient proof of retaliation. Perez then informed Plaintiff that Ms. O'Neal was calling for her termination, but that DPI was allegedly fighting to have her stay on at the FRA because she was highly rated in her previous postings and had received nothing but accolades for her performance.

25. Defendant knew Plaintiff's complaints regarding O'Neal and Willis to be true or at least could be true such that it warranted an investigation, but DPI doggedly supported its client over the rights of its employee.

26. Defendant's HR department was supposed to contact Ms. Kennedy following her August 30, 2018 meeting with Perez to follow up with her on her retaliation claim but they never did. Instead, on the same day as the August 30, 2018 meeting with Perez, Ms. Kennedy received an email from him informing her that she would be placed on a Performance Improvement Plan (PIP).

27. Ms. Kennedy went back to EEO on or about August 30, 2018 to file a retaliation complaint against Ms. O'Neal.

28. Ms. Jensen again accompanied Plaintiff and they again met with Shandra Whiting. During this meeting, Ms. Kennedy detailed the many acts of retaliation by Ms. O'Neal, including the way Ms. O'Neal was criticizing her for her pregnancy related medical issues. Ms. Whiting told Plaintiff that she had a pregnancy related disability and advised her to request an accommodation based on that disability. Ms. Whiting instructed Ms. Kennedy to type up her accommodation request and send it to Defendant (through Mr. Perez), Ms. O'Neal, and herself. Ms. Kennedy did as

instructed and in her email, she requested two accommodations (1) to sit at a desk closer to the bathroom; and (2) the ability to telework when her hyperemesis flared up.

29. Defendant refused to meaningfully address Plaintiff's request for accommodation.

30. Perez engaged in delay tactics. He would periodically email Ms. Kennedy indicating that a decision was forthcoming about her accommodation requests, but progress was never made.

31. For example, on or about September 10, 2018, Ms. Kennedy received an email from Perez indicating that DPI had made progress on her accommodation requests. He told Ms. Kennedy that the FRA would move her to a desk closer to the bathroom and provide her with the option to take five-minute breaks during the day to go outside and get some air to combat her hyperemesis. Ms. Kennedy emailed him back to say that she was frustrated about the lack of progress and that five-minute breaks would not be a sufficient substitute for the ability to telework when her condition flared up. Her workspace was never moved even though Perez indicated that this request had been granted.

32. During this time, Ms. O'Neal continued to retaliate against Ms. Kennedy based on her protected activity and discriminate against her based on her pregnancy related disability. On September 12, 2018, Ms. Kennedy emailed Mr. Perez: "At this point I feel really singled out by my COR. It may be caused because her relationship with who I reported to EEO (because once again they are friends here.). Everything I do is an issue…At this point I feel she is nit picking and finding every reason to try to have me terminated." Ms. Kennedy again requested that DPI transfer her to another position.

33. Mr. Perez responded to Ms. Kennedy's email the following day. Instead of addressing Ms. Kennedy's complaints or conducting an investigation, he told her again that she had not provided him with sufficient examples of retaliation. Perez wrote, "I hope you can understand I

10

can't go to FRA and make the claim that they are nitpicking on you because of your complaint without evidence."

34. Ms. Kennedy was distressed by Mr. Perez's apparent lack of concern and replied that day via email: "once again I need to be moved as soon as possible because this is stressful and I am scared at this point I will miscarry my child due to the fact of her constant issue with everything. I go home crying and stressed every single day."

35. The following week, on September 19, 2019 Ms. Kennedy sent Mr. Perez another email explaining that Ms. O'Neal continued to target her by assigning her tasks in PRISM that Ms. Kennedy had not been properly trained to perform and that she was telling other employees that Ms. Kennedy was incompetent.

36. On September 28, 2018, Plaintiff received another email from Mr. Perez indicating that her accommodation requests still had not been approved. Ms. Kennedy told Defendant that she did not understand why the accommodation requests were taking so long given that there were five empty desks by the bathroom and that other coworkers were permitted to telework.

37. Upon information and belief, this Defendants refusal to accommodate Plaintiff was done in retaliation for Plaintiff's complaints to the EEO and for exercising her rights to request a reasonable accommodation under the Protecting Pregnant Workers Fairness Act of 2014 and the D.C. Human Rights Act. Defendant never intended to accommodate Plaintiff and instead aimed to drive her to resign.

38. In frustration, Ms. Kennedy went to speak with Ms. Whiting again on September 28, 2018.

39. On Monday, October 1, 2018, Defendant through Michael Perez sent Ms. Kennedy an email asking for her to call him. She called him right away and he told her she was not a "good fit for the position" and that she was terminated.

40. Defendant sent Plaintiff a letter following their conversation, which falsely claimed that Plaintiff's position was discontinued due to contract changes by the Federal Railroad Administration. In truth, Plaintiff's termination was in retaliation for her past EEO activity, gender and disability discrimination and for making a request to accommodate her pregnancy-related disability.

**COUNT I:**
**Failure to Accommodate Disability in Violation of the**
**Protecting Pregnant Workers Fairness Act**

41. Plaintiff incorporates the paragraphs above as if specifically set forth herein.

42. The Protecting Pregnant Workers Fairness Act of 2014 (PPWFA), D.C. Code § 32-1231.01 *et seq.*, requires an employer to "engage in good faith in a timely and interactive process with an employee requesting or otherwise needing a reasonable accommodation to determine a reasonable accommodation for that employee." D.C. Code § 32-1231.02. As defined by the statute, "reasonable accommodation" means an accommodation that does not cause undue hardship in the operation of the employer's business that an employer can make for an employee whose ability to perform the functions of the employee's job are affected by pregnancy, childbirth, a related medical condition, or breastfeeding, including: (a) More frequent or longer breaks; (b) Time off to recover from childbirth; (c) The acquisition or modification of equipment or seating; (d) The temporary transfer to a less strenuous or hazardous position or other job restructuring such as providing light duty or a modified work schedule; (e) Having the employee refrain from heavy lifting; (f) Relocating the employee's work area; or (g) Providing private non-bathroom space for expressing breast milk. D.C. Code § 32-1231.01.

43. It is a violation for an employer to "refuse to make reasonable accommodations to the known limitations related to pregnancy, childbirth, related medical conditions, or breastfeeding for an employee, unless the employer can demonstrate that the accommodation would impose an

12


undue hardship." D.C. Code § 32-1231.03.  Nor may an employer "[t]ake an adverse action against an employee who requests or uses a reasonable accommodation in regard to the employee's conditions or privileges of employment…" *Id.*

44. Plaintiff suffered from a pregnancy related disability called hyperemesis gravidarum, which is a severe form of what is typically referred to as morning sickness.  This condition caused Plaintiff to feel extreme nausea, vomiting and dizziness at various times throughout the day. Common accommodations for women who suffer from hyperemesis gravidarum include permission to take more frequent bathroom breaks, to eat small snacks during work hours, a cot for lying down and to telework when the condition flares up.

45. Plaintiff alleges her impairment caused her to be actually disabled under the PPWFA. This is because she was substantially limited due to her impaired digestive system which is recognized as one of the major life activities whose substantial limitation qualifies as a disability.

46. Plaintiff is an employee "requesting or otherwise needing a reasonable accommodation." D.C. Code § 32-1231.02(a).  Specifically, Plaintiff asked that her desk be moved closer to the bathroom so that she would not travel a far distance when she felt nauseous and/or the urge to vomit.  She also asked that she be permitted to telework when her condition significantly flared up.

47. Defendant DPI is an "employer" and/or an "employment agency" as defined by the D.C. Code §§ 2-1401.02 (10) and (11).

48. Defendant failed to engage in the interactive process with Plaintiff in good faith and denied her any accommodation.  Defendants denied Plaintiff's request to telework and move her desk closer to the bathroom.  Although Defendant informed Plaintiff that her desk relocation request was granted, this was false and Defendant terminated Plaintiff prior to allegedly effectuating either of her accommodation requests.

49. Due to Defendant's failure to engage in the interactive process and accommodate Ms. Kennedy, she continued to suffer symptoms related to her condition without any relief whatsoever. In addition, during the time that Defendant was purportedly considering her accommodation request, Ms. O'Neal continued to harass Ms. Kennedy including chastising her for her use of the bathroom. Ms. Kennedy's mental state during this time is encapsulated in an email she sent to Mr. Perez essentially begging for his assistance. She wrote, "once again I need to be moved as soon as possible because this is stressful and I am scared at this point I will miscarry my child...I go home crying and stressed every single day…"

50. As a result of the denial of accommodation and termination, Plaintiff experienced financial harm, including loss of income and loss of future income. Ms. Kennedy respectfully requests 1) Back pay with interest for lost wages resulting from Defendant's violation of PPWFA; (2) Reinstatement or other injunctive relief including front pay; and (3) Reasonable attorney's fees and costs of enforcement.

## COUNT II:
## Wrongful Termination in Violation of the Protecting Pregnant Workers Fairness Act

51. Plaintiff incorporates the paragraphs above as if specifically set forth herein.

52. The PPWFA prohibits an employer such as Defendant from taking an adverse action against an employee who requests a reasonable accommodation.

53. Defendant unlawfully terminated Plaintiff because she requested an accommodation to accommodate her pregnancy related condition, hyperemesis gravidarum.

54. Accordingly, Ms. Kennedy respectfully requests 1) Back pay with interest for lost wages resulting from Defendant's violation of PPWFA; (2) Reinstatement or other injunctive relief including front pay; and (3) Reasonable attorney's fees and costs of enforcement.

## COUNT III:
### Retaliation in Violation of the D.C. Human Rights Act

55. Plaintiff incorporates the paragraphs above as if specifically set forth herein.

56. The District of Columbia Human Rights Act, D.C. Code § 2-1401.01 *et seq.* (hereinafter the "DCHRA") makes it unlawful for an employer like Defendant to retaliate against an employee for opposing an employment practice that is prohibited by the Act or Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e-3(a).

57. Plaintiff engaged in various forms of protected activity including when: she complained to the EEO regarding Willis's conduct and O'Neal retaliation, she requested a reasonable accommodation from Defendant and also when she complained to Defendant in August of 2018, that she had been sexually harassed by Willis and retaliated against by O'Neal for complaining about Willis's sexual harassment.

58. Defendant terminated Plaintiff in retaliation for opposing discriminatory practices and/or for requesting a reasonable accommodation in violation of the District of Columbia Human Rights Act. Moreover, Defendant falsely claimed that it could (or would not) employ Plaintiff in any other positions within the company, as a contract employee or otherwise, because no other positions were available.

59. Defendants retaliatory animus is revealed by the fact that it immediately put Plaintiff on a Performance Improvement Plan right after she requested an accommodation and/or complained to Mr. Perez regarding Mr. Willis's and O'Neal's unlawful conduct. Even though Ms. Kennedy told Mr. Perez that Willis and O'Neal's allegations regarding her performance were false and provided an email from Mr. Hess demonstrating that their allegations were false, rather than investigate Ms. Kennedy's complaint, Defendant placed her on a PIP and terminated her a month later.

60. As a result of Defendant's unlawful conduct, Plaintiff was terminated from her position and suffered economic damages resulting from the loss of her employment. Plaintiff has also suffered emotional pain and suffering, including embarrassment, humiliation, anxiety, stress, a loss of self-esteem and feelings of worthlessness.

61. Defendant acted with reckless disregard and/or malice toward Plaintiff when it placed her on a PIP and terminated her in retaliation for her protected conduct, such that Plaintiff is entitled to punitive damages in addition to economic and compensatory damages.

## COUNT IV:
## Gender Discrimination in Violation of the D.C. Human Rights Act

62. Plaintiff incorporates the paragraphs above as if specifically set forth herein.

63. Under the DCHRA, discrimination on the basis of sex includes discrimination on the basis of pregnancy and related medical conditions. D.C. Code § 2-1401.05.

64. Defendant placed Plaintiff on a PIP and subjected her to a discriminatory termination because of her sex (including that she was a pregnant woman) in violation of the D.C. Human Rights Act, D.C. Code § 2-1402.11.

65. As a result of Defendant's unlawful conduct, Plaintiff suffered economic damages resulting from the loss of her employment. Plaintiff has also suffered emotional pain and suffering, including embarrassment, humiliation, anxiety, stress, a loss of self-esteem and feelings of worthlessness.

66. Defendants engaged in intentional discrimination against Ms. Kennedy with malice and/or with reckless indifference to Ms. Kennedy's protected rights when they terminated her employment because of her gender, such that Plaintiff is entitled to punitive damages in addition to economic and compensatory damages.

## COUNT V:
## Disability Discrimination in Violation of the D.C. Human Rights Act

67. Plaintiff incorporates the paragraphs above as if specifically set forth herein.

68. Under the DCHRA, discrimination on the basis of sex includes discrimination on the basis of pregnancy and related medical conditions. D.C. Code § 2-1401.05.

69. Defendant placed Plaintiff on a PIP and subjected her to a discriminatory termination because of her disability (hyperemesis gravidarum) in violation of the D.C. Human Rights Act, D.C. Code § 2-1402.11.

70. As a result of Defendant's unlawful conduct, Plaintiff suffered economic damages resulting from the loss of her employment. Plaintiff has also suffered emotional pain and suffering, including embarrassment, humiliation, anxiety, stress, a loss of self-esteem and feelings of worthlessness.

71. Defendants engaged in intentional discrimination against Ms. Kennedy with malice and/or with reckless indifference to Ms. Kennedy's protected rights when they terminated her employment because of her disability, such that Plaintiff is entitled to punitive damages in addition to economic and compensatory damages.

## PRAYER FOR RELIEF

WHEREFORE, Ms. Kennedy respectfully prays that this Court enter judgment against Defendant as follows:

a) enter a declaratory judgement finding that Defendants violated D.C. Code § 2-1401.01, *et seq.*;

b) enter a permanent injunction directing Defendant to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent similar occurrences in the future;

c) award compensatory damages pursuant to the DCHRA in an amount to be determined by the jury that would fully compensate Plaintiff for the economic loss, humiliation, embarrassment, and mental and emotional distress caused by the conduct of Defendant as alleged herein;

d) award punitive damages to Plaintiff pursuant to the DCHRA in an amount to be determined by the jury that would punish Defendant for its willful, wanton, and reckless conduct alleged herein and that would effectively deter Defendant from engaging in similar conduct in the future;

e) award Plaintiff reasonable attorneys' fees and costs incurred in this action;

f) order such other relief as this Court deems just and equitable.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Respectfully submitted,

/s/ Sundeep Hora
Sundeep Hora (D.C. Bar. No. 472944)
Savanna L. Shuntich (D.C. Bar. No 1034411)
ALDERMAN, DEVORSETZ & HORA PLLC
1025 Connecticut Ave., NW
Suite 615
Washington, D.C. 20036

Tel. 202.969.8220
Fax 202.969.8224
E-mail: shora@adhlawfirm.com

*Attorneys for Plaintiff*