UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DIAMOND KENNEDY,

*Plaintiff*,

v.

PETE BUTTIGIEG, *Secretary of United States Department of Transportation*,[1]

*Defendant.*

Civil Action No. 19-2212 (RDM)
(consolidated with No. 19-2666 (RDM))

## MEMORANDUM OPINION AND ORDER

Although Plaintiff Diamond Kennedy originally brought these consolidated actions against the Secretary of Transportation (hereinafter the "Department") and a Department of Transportation contractor, Dynamic-Pro, Inc. (hereinafter "Dynamic-Pro"), the parties have stipulated to the dismissal of Dynamic-Pro, Min. Order (April 26, 2021), Kennedy has voluntarily dismissed two counts against the Department, Min. Order (Feb. 12, 2021), and, most recently, she withdrew an additional count against the Department, Dkt. 39 at 8. As a result, all that remains are three claims against the Department: Count I, which alleges that Kennedy was subjected to a hostile work environment based on gender, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"); Count II, which alleges that she was subjected to a retaliatory hostile work environment and retaliatory termination, also in violation

---

[1] The current Secretary is automatically substituted for his predecessor. Fed. R. Civ. P. 25(d). On December 13, 2019, the Court consolidated *Kennedy v. Dynamic-Pro, Inc.*, No. 19-cv-2212, and *Kennedy v. Chao*, No. 19-cv-2666, pursuant to Federal Rule of Civil Procedure 42(a), and directed the parties to file all pleadings and motions in No. 19-cv-2212, Min. Order (Dec. 13, 2019).

of Title VII; and Count III, which alleges that the Department failed to accommodate her disability, in violation of the Rehabilitation Act, 29 USC § 701 *et seq*.

The Department now moves for summary judgment on each of Kennedy's remaining claims.  Dkt. 32.  For the following reasons, the Court will **GRANT** in part and **DENY** in part the Department's motion.

## I. BACKGROUND

For purposes of resolving the motion for summary judgment, the Court takes "the facts in the record and all reasonable inferences derived therefrom in a light most favorable" to Kennedy, the non-moving party.  *Coleman v. Duke*, 867 F.3d 204, 209 (D.C. Cir. 2017) (quoting *Al-Saffy v. Vilsack*, 827 F.3d 85, 89 (D.C. Cir. 2016)).

### A.    Factual Background

#### 1.    *Kennedy's employment at the FRA*

The Federal Railroad Administration ("FRA") is an agency within the Department of Transportation.  Dkt. 39-6 at 1–2 (Pl.'s Statement of Material Facts in Dispute ("Pl.'s SDMF") ¶ 3); Dkt. 42-1 at 2 (Def.'s Response to Pl.'s SDMF ("Def.'s Response") ¶ 3).  Dynamic-Pro is a government contractor, which provides administrative support to government agencies, including the FRA.  Dkt. 32-2 at 1 (Def.'s Statement of Undisputed Material Facts ("SUMF") ¶ 2); *see also* Dkt. 39-7 at 1 (Pl.'s Response to SUMF ("Pl.'s Response") ¶ 2).  In August 2017, Dynamic-Pro offered Diamond Kennedy a position as an administrative assistant.  Dkt. 32-2 at 1 (Def.'s SUMF ¶ 1); *see also* Dkt. 39-7 at 1 (Pl.'s Response ¶ 1).  The next month, Kennedy started work at the FRA as a contract Administrative Assistant in the Office of the Administrator, where she worked for Patrick Warren, the FRA's Executive Director.  Dkt. 32-2 at 2 (Def.'s SUMF ¶ 4); *see also* Dkt. 39-7 at 1 (Pl.'s Response ¶ 4).  A short time later, on November 20, 2017, Kennedy

was reassigned to the FRA's Government Affairs Office, where she provided administrative

support for Christopher Hess, the FRA's Director of Administrative Affairs.  Dkt. 32-2 at 3

(Def.'s SUMF ¶¶ 6–9); *see also* Dkt. 39-7 at 2 (Pl.'s Response ¶¶ 6–9).

  For budget reasons, Kennedy was subsequently transferred to the position of

Administrative Assistant II in the FRA's Office of the Chief Financial Officer ("RCFO"), where

she started work on July 16, 2018.  Dkt. 39-6 at 15 (Pl.'s SDMF ¶¶ 45–46); Dkt. 42-1 at 25–26

(Def.'s Response ¶¶ 45–46).  The head of RCFO was Rebecca Pennington, and Kennedy's new

Contracting Officer Representative ("COR") was Yulita O'Neal.  Dkt. 39-6 at 15–16 (Pl.'s

SDMF ¶¶ 46, 48); Dkt. 42-1 at 26–27 (Def.'s Response ¶¶ 46, 48).

  2. *Alleged sexual harassment*

  The events leading to this case began in the fall of 2017, when Kennedy was transferred

to the Government Affairs Office.  That office shared an office suite with the Office of Public

Affairs, and the Deputy Director of the Office of Public Affairs was Marc Willis.  Dkt. 32-2 at 3

(Def.'s SUMF ¶ 10); *see also* Dkt. 39-7 at 2 (Pl.'s Response ¶ 10).  Kennedy alleges that within a

month of starting at Government Affairs, Willis began to sexually harass her.  Dkt. 39-6 at 5

(Pl.'s SDMF ¶ 17); Dkt. 42-1 at 7 (Def.'s Response ¶ 17).

  Kennedy recalls the first alleged incident with Willis:  When she was leaving the office,

Willis was "ogling [her] body," and, when she returned, her co-worked Ashante Jorden told

Kennedy that Willis "asked if [Kennedy] was a stripper" because her "butt is big."  Dkt. 39-1 at

181 (Pl.'s Ex. 4, Kennedy Dep. at 57:19–58:4).  Kennedy testified that Willis engaged in similar

ogling on five or six other occasions.  *Id.* at 183–84 (Pl.'s Ex. 4, Kennedy Dep. at 68:13–69:15).

When asked about this by an Equal Employment Opportunity ("EEO") investigator, Willis did

not dispute that he ogled Kennedy and merely stated: "I am a heterosexual male, I may have

noticed.  But I did not laugh[,] and I do not make comments about someone's figure."  *Id.* at 1584 (Pl.'s Ex. 19).   According to Kennedy, "when [she] was about to move over to Government Affairs[,]" Willis "kept coming up to [her] and telling [her] the whole week that [she] was getting ready to work for him and [she] was going to be his assistant," *id.* at 185 (Pl.'s Ex. 4, Kennedy Dep. at 74:10–74:22), although she was ultimately assigned to work as Chris Hess's assistant, *see* Dkt. 32-2 at 3 (Def.'s SUMF ¶¶ 6–9); *see also* Dkt. 39-7 at 2 (Pl.'s Response ¶¶ 6–9).  Willis allegedly told Kennedy that Hess only wanted her in his office "because of [her] looks."  Dkt. 39-1 at 185 (Pl.'s Ex. 4, Kennedy Dep. at 74:4–75:5).

Kennedy also alleges that, on one occasion, Willis stopped by her desk to ask for a piece of gum "and said he might not know when [she] will want a kiss from him."  *Id.* at 184 (Pl.'s Ex. 4, Kennedy Dep. at 70:24–71:8).  Later in that same interaction, Willis purportedly told Kennedy that "he was jealous of the [hickies] on [her] neck and that he wasn't the one to give them to [her] or put them there."  Dkt. 39-1 at 186 (Pl.'s Ex. 4, Kennedy Dep. at 77:16–78:10).  Willis admits to making a different comment about Kennedy's neck, claiming that he "did tell her she needed to cover up the marks on her neck with makeup because they were unprofessional."  Dkt. 39-1 at 1585 (Pl.'s Ex. 19).  On another occasion, Willis asked to get in front of Kennedy in the line for the printer.  Kennedy responded, "in a 'non-sexual manner,'" "ok, you can get in front of me but it may cost ya," to which Willis allegedly responded "'I am willing to pay for certain things.'"  Dkt. 39-1 at 184 (Pl.'s Ex. 4, Kennedy Dep. at 72:11–19).

Kennedy made other allegations against Willis.  In a chat message with a co-worker, Antoinette Jensen, for example, Kennedy told Jensen that Willis "tell[s me] im beautiful all the time."  Dkt. 39-1 at 1573 (Pl.'s Ex. 17).  At her deposition in this case, she testified Willis told her "how nice [she] look[ed] in [her] jeans on Fridays" and told her "how pretty [she is] and that

if he was [her] age he would date [her.]"  Dkt. 39-1 at 185 (Pl.'s Ex. 4, Kennedy Dep. at 75:9–

76:4).  She also testified that Willis told Jensen that he was "a dirty old man" who "grabb[ed]"

nurses' "butts."  Dkt. 39-1 at 185 (Pl.'s Ex. 4, Kennedy Dep. at 76:8–24).  Willis admitted to

making a "similar comment" in the workplace.  Dkt. 39-1 at 1380–81 (Deposition of Marc Willis

at 89:10–90:14).

When asked at deposition whether others were in earshot when Willis made inappropriate

comments to her, Kennedy responded, "[h]e would only do it when I was by myself."  Dkt. 39-1

at 234 (Pl.'s Ex. 4, Kennedy Dep. at 269:6–9).  And when asked, "[o]ut of all the times that you

were alone with him . . . [,] how often would he make a comment that you would consider to be

improper or a form of sexual harassment," she responded, "[p]retty much every time, which was

far and few because I was rarely by myself."  Dkt. 39-1 at 234 (Pl.'s Ex. 4, Kennedy Dep. at

269:10–16).

Shortly after her reassignment to RCFO, Kennedy and Jensen met with the FRA's EEO

Program Manager, Shandra Whiting, to discuss Willis' conduct.  Dkt. 32-2 at 12 (Def.'s SUMF

¶ 38); *see also* Dkt. 39-7 at 10 (Pl.'s Response ¶ 38).  A few days later, on July 25, 2018, the

Office of Civil Rights completed its inquiry and its director, Calvin Gibson, submitted a

recommendation to Matthew Sturges, FRA's Deputy Administrator.  Dkt. 32-2 at 16 (Def.'s

SUMF ¶ 49); *see also* Dkt. 39-7 at 16–17 (Pl.'s Response ¶ 49).  Gibson recommended that

because Willis "ha[d] no prior allegations, his supervisor would call the situation to his attention

without disclosing who complained.'"  Dkt. 32-2 at 16–17 (Def.'s SUMF ¶ 49); *see also* Dkt. 39-

7 at 16–17 (Pl.'s Response ¶ 49).  There is evidence, however, that Willis did learn that Kennedy

was his accuser, although it is unclear how he learned that Kennedy had complained about his

behavior.  *See* Dkt. 39-1 at 188 (Kennedy Dep. at 88:20–25); Dkt. 39-6 at 28 (Pl.'s SDMF ¶ 97).

On July 30, 2018, Gibson met with Willis concerning the allegations, which Willis denied, except for the "dirty old man" comment. Dkt. 32-2 at 17 (Def.'s SUMF ¶ 51); *see also* Dkt. 39-7 at 17 (Pl.'s Response ¶ 51). On July 31, 2018, Whiting emailed Kennedy and Jensen to tell them "that the issue you both informed me of on Friday, July 20, 2018 was looked into and addressed accordingly." Dkt. 32-2 at 17 (Def.'s SUMF ¶ 52); *see also* Dkt. 39-7 at 18 (Pl.'s Response ¶ 52). It is undisputed that after Kennedy reported Willis' inappropriate behavior, no additional incidents of sexual harassment occurred. Dkt. 32-2 at 17 (Def.'s SUMF ¶ 53); *see also* Dkt. 39-7 at 18 (Pl.'s Response ¶ 53).

3.   *Kennedy's performance, improvement plan, and termination*

The Department denies that it took any adverse action against Kennedy in retaliation for her accusations against Willis, and it instead maintains that Kennedy was a subpar employee who could not handle the responsibilities of her assignment to RCFO. According to the Department, various FRA employees raised concerns about Kennedy's performance as early as December 2017, while she was still working in the Government Affairs office. One employee, for example, complained about Kennedy's failure to reschedule a meeting, and a feedback form provided to Dynamic-Pro described concerns about Kennedy's ability to schedule and coordinate meetings. Dkt. 32-2 at 4–5 (Def.'s SUMF ¶¶ 12–13); *see also* Dkt. 39-7 at 3 (Pl.'s Response ¶¶ 12–13). The FRA Contracting Officer Representative ("CRO") responsible for the Dynamic-Pro account at the time, Maryanne Polkiewicz, told Dynamic-Pro in December 2017 that the Department was considering replacing Kennedy, although the matter was apparently dropped after further discussion between the Department and Dynamic Pro. Dkt. 32-2 at 5 (Def.'s SUMF ¶¶ 14); *see also* Dkt. 39-7 at 4 (Pl.'s Response ¶¶ 14). There were a couple of other incidents in February (working 9 instead of 8 hours on two days) and March (trying to delegate lead

responsibility to arrange a "meet and greet") 2018.  Dkt. 32-2 at 5–6 (Def.'s SUMF ¶¶ 15–16); *see also* Dkt. 39-7 at 5 (Pl.'s Response ¶¶ 15–16).

Other evidence, however, suggests that Kennedy was a regarded as a stronger performer before she was transferred to RCFO.  Perhaps most significantly, there is some indication that Hess—who Kennedy supported during the time she worked in the Government Affairs Office—did not want Kennedy to leave and, indeed, made efforts to keep her as his assistant.  Dkt. 39-1 at 191 (Kennedy Dep. at 99:17–18); 39-1 at 333 (Perez Dep. at 48:8–11).   This is consistent with feedback that Lee Anderson, the responsible FRA contracting officer, provided to Dynamic-Pro in December 2017, which noted that Kennedy and others were "very professional and produce[d] good work" and reported that the FRA was "very pleased with their performance," but recommend that, "when they have completed work assignments and have bandwidth for additional work," they should convey their availability.  Dkt. 39-2 at 639 (Ex. 32).  When Anderson reported to Kennedy's Dynamic-Pro supervisor, Michael Perez, in August 2018 that the FRA had concerns about Kennedy's performance, moreover, Perez expressed surprise, noting that Kennedy had a strong track record and had been at RCFO for only a short time.  Dkt. 39-3 at 128 (Ex. 50).

The principal allegations of poor performance—the allegations more pertinent to this case—occurred over the summer of 2018, after Kennedy transferred to RCFO.  Yvette Noah, Dynamic-Pro's Human Resources ("HR") Manager, testified at deposition that Kennedy "would take a long time to get tasks done" and that, "[i]f she did get them done, she would not communicate well from what I've heard with the FRA staff, but she wouldn't communicate well with me as an HR manager.  She wouldn't communicate well with Michael Perez as her project manager.  She would send very unprofessional e-mails," which contained typos and grammatical

errors.  Dkt. 32-4 at 772–73 (Noah Dep. at 61:21–62:19).  When asked whether Kennedy "was performing the work that was required of her as an Admin II as FRA," Noah responded, "No." Dkt. 32-4 at 774 (Noah Dep. at 63:2–6).

Pennington, the Department's Chief Financial Officer, submitted a declaration attesting that "the Staff Directors and the Contracting Officer Representative, Yulita O'Neal, raised concerns and complaints with Ms. Kennedy's work performance.  The issues included, but were not limited to, Ms. Kennedy's lack of initiative, lack of attention to detail, and inability to follow-up on assignments."  Dkt. 32-4 at 2128 (Declaration of Rebecca Pennington ¶ 7). Pennington further attested that Kennedy "could not complete simple tasks, such as updating the [Office] calendar and making photocopies[,]" "did not properly maintain the [Office] calendar[,]" "failed to acknowledge emails and assignments she received, which caused confusion as to whether she had completed the assignment[,]" and that her "attitude at work was off-putting and her body language discouraged people from approaching her and giving her assignments or asking her work questions."  Dkt. 32-4 at 2128–29 (Pennington Decl. ¶¶ 8–11). O'Neal raised similar concerns in her declaration and also claimed that "Kennedy was infrequently at her desk when [Staff Directors] wanted to give her assignments."  Dkt. 32-4 at 1694–95 (Declaration of Yulita O'Neal ¶¶ 8–9, 12).

On August 9, 2018, Noah met with O'Neal to discuss Kennedy's performance.  Dkt. 39-6 at 35 (Pl.'s SDMF ¶ 116); Dkt. 42-1 at 57 (Def.'s Response ¶ 116).  Noah's notes from that meeting indicate that O'Neal was concerned that Kennedy had been arriving to work about twenty minutes late and that she was failing to send email acknowledgments to work requests from leadership.  Dkt. 39-6 at 35 (Pl.'s SDMF ¶ 117); Dkt. 42-1 at 57 (Def.'s Response ¶ 117). Kennedy subsequently explained to Noah that she was arriving to work on time but had to spend

8

the morning in the restroom because she was suffering from hyperemesis gravidarum (*i.e.*, extreme morning sickness) and that she would stay late on those days. Dkt. 39-6 at 35 (Pl.'s SDMF ¶ 118); Dkt. 42-1 at 57 (Def.'s Response ¶ 118). "Kennedy agreed to stop by O'Neal's office as soon as she arrived to let her know that she was in and [to] adjust her written schedule accordingly on the days she stayed late." Dkt. 39-6 at 35 (Pl.'s SDMF ¶ 119); *see also* Dkt. 42-1 at 57 (Def.'s Response ¶ 119). She also agreed to start sending email acknowledgments to tasks. Dkt. 39-6 at 35–36 (Pl.'s SDMF ¶ 120); Dkt. 42-1 at 57–58 (Def.'s Response ¶ 120).

There is evidence that Kennedy's performance improved in certain respects. On August 22, 2018, for example, O'Neal sent Anderson an email noting that she had "seen improvements" relating to Kennedy's "[d]aily arrival time to work." Dkt. 39-3 at 5 (Ex. 42). O'Neal also conceded in deposition that she had seen "improvement" in Kennedy's acknowledgment that she had received requests to schedule meetings. Dkt. 39-2 at 393–141 (O'Neal Dep. at 138:4– 141:9); *see also* Dkt. 39-3 at 83–124 (Ex. 49) (collecting emails). The FRA expressed concerns, instead, about "her number of times of being out of the office," and that "she seems quite overwhelmed with the workload." Dkt. 32-7 at 260 (Def.'s Ex. 122).

On August 16, 2018, O'Neal wrote to the Department's Contracting Officer Lee Anderson, stating that Pennington "would like for [Dynamic-Pro] to obtain resumes for potential candidates to replace" Kennedy due to her tardiness and lack of attendance. Dkt. 32-7 at 261 (Def.'s Ex. 122). On August 22, 2018, O'Neal again wrote to Anderson, indicating that Kennedy "is not working out in [the office, and that] the senior managers do not wish to keep her during the interim of recruitment for a replacement." Dkt. 32-5 at 464–65 (Def.'s Ex. 56). The next day, Anderson wrote to Perez and Noah, stating that the office "would like to replace" Kennedy, indicating that "[s]he apparently cannot handle the [Office's] workload," and

"requesting [that] tomorrow be her last day." Dkt. 32-5 at 470 (Def.'s Ex. 57). Perez responded that Kennedy had succeeded in prior roles in the Department and requested that Dynamic-Pro be allowed to develop a Performance Improvement Plan ("PIP") for Kennedy. Dkt. 32-5 at 469–70 (Def.'s Ex. 57). On August 29, Anderson emailed Perez and Noah to inform them that Kennedy would remain in the office, subject to a thirty-day PIP. Dkt. 32-5 at 483 (Def.'s Ex. 61).

On August 30, 2018, Dynamic-Pro notified Kennedy that she was being placed on a PIP starting September 1. *See* Dkt. 32-5 at 502 (Def.'s Ex. 67). Also on August 30, Kennedy met with Whiting, this time to complain about retaliation by Willis and O'Neal. *See* Dkt. 39-6 at 51 (Pl.'s SDMF ¶ 175); *see also* Dkt. 42-1 at 82 (Def.'s Response ¶ 175). Later that day, Kennedy sent Whiting a follow-up email summarizing the events relating to her retaliation claim. *See* Dkt. 39-4 at 30 (Pl.'s Ex. 62). In the email, Kennedy noted that she had been criticized for her "not responding 'ok' back to attendance calendar updates, [i]ncorrect entry on shared attendance calendar . . . [,] being 15-20 minutes late to my desk seat (due to my hyperemesis pregnancy)," scheduling a meeting incorrectly, and scheduling travel on one occasion for Chris Hess (who was no longer her boss). *Id.* She further explained that she "was told FRA would like to drop" her even though she had "received nothing but compliments in my prior two offices." *Id.* Whiting testified at deposition that, aside from advising Kennedy about the EEO process, she could not recall any further efforts the FRA took to investigate Kennedy's claims of retaliation. Dkt. 39-2 at 721–22 (Whiting Dep. at 68:22–69:4).

Kennedy contends that O'Neal never provided her with the opportunity to succeed under the PIP. On September 17, 2018, for example—just two weeks into the 30-day PIP period— O'Neal shared with Pennington a draft email that she planned to send to Lee Anderson, who was

responsible for the Dynamic Pro contract.  *See* Dkt. 39-3 at 137 (Pl.'s Ex. 52).  The draft email,

which Anderson saw for the first time at his deposition, stated:

> Lee,
>
> Based on the performance issues raised, there has been little improvement at this
> point.  We would like to request to have [Kennedy] removed from this contract.

*See* Dkt. 39-3 at 137 (Pl.'s Ex. 52).  Kennedy also points out that O'Neal was aware at the time

the PIP was put in place that a "complication associated with [Kennedy's] pregnancy . . . was

causing her to be late for work," Dkt. 39-2 at 476 (Pl.'s Ex. 27, O'Neal Dep. at 221:5–17), but

O'Neal "made no effort to have [the late arrival] section removed" from the PIP, Dkt. 39-6 at 57.

And Kennedy stresses that while criticizing her performance, O'Neal rebuffed her request to

receive additional training on the Department's acquisition system, PRISM.  *See* Dkt. 39-6 at

61–63 (Pl.'s SDMF ¶¶ 215–223).

Two days before the end of the PIP period, on September 28, 2018, O'Neal emailed

Anderson, stating: Dynamic-Pro "hasn't met our requirements for the level 2 admin assistant

which is continuing to present a hardship for the office.  There hasn't been a great deal of

improvement in the current situation and [we] respectfully request DPI remove the current

candidate, until such time that a qualified candidate can be hired."  Dkt. 39-5 at 2 (Pl.'s Ex. 81).

Then, on October 1, 2018, Brittany Alvarenga, the Contracting Officer who took over for

Anderson, sent an email to Perez, writing, "I am currently acting for Lee and it has come to my

attention that a replacement is needed for [Kennedy] effective immediately.  I know she was put

on a PIP in hopes things would improve, but unfortunately things have not."  Dkt. 39-5 at 8 (Pl.'s

Ex. 83).  That same day, Kennedy was both removed from her position at the Department and

terminated by Dynamic-Pro.  *See* Dkt. 39-5 at 11 (Pl.'s Ex. 84).

4.      *Kennedy's accommodations requests*

Separately, in July 2018, Kennedy informed Pennington, O'Neil, and Noah that she was pregnant.  During her pregnancy, Kennedy suffered from "hyperemesis gravidarum, best characterized as an extreme form of morning sickness that can occur at any time during the day or night."  Dkt. 39-6 at 18 (Pl.'s SDMF ¶ 57); *see also* Dkt. 42-1 at 29 (Def.'s Response ¶ 57). "The condition causes headaches, stomach irritability, nausea, and vomiting and requires frequent trips to the restroom to alleviate symptoms."  Dkt. 39-6 at 18 (Pl.'s SDMF ¶ 58); *see also* Dkt. 42-1 at 29 (Def.'s Response ¶ 58).  Kennedy was admitted to the hospital for the condition on several occasions.  Dkt. 39-6 at 18 (Pl.'s SDMF ¶ 59); *see also* Dkt. 42-1 at 29 (Def.'s Response ¶ 59).

On September 5, 2018, Kennedy requested various accommodations for this condition. In particular, she requested: (1) a desk near the restroom, and (2) permission to telework on days when her condition was most affecting her.  Dkt. 39-6 at 52 (Pl.'s SDMF ¶¶ 179–80); *see also* Dkt. 42-1 at 83–84 (Def.'s Response ¶¶ 179–80).  She provided the Department a note from her treating physician diagnosing the condition.  Dkt. 39-6 at 53 (Pl.'s SDMF ¶ 181); *see also* Dkt. 42-1 at 84 (Def.'s Response ¶ 181).  On September 28, 2018, Perez, who was still serving as Kennedy's Dynamic-Pro supervisor, emailed Kennedy to let her know that the request for a desk closer to the bathroom had been granted and that FRA could offer her 5-minute breaks once an hour; but the FRA would permit Kennedy to telework only if Dynamic-Pro could find someone to cover for Kennedy on her days-off, which Perez did not think was feasible.  Dkt. 39-6 at 73–74 (Pl.'s SDMF ¶ 260); *see also* Dkt. 42-1 at 120 (Def.'s Response ¶ 260).  Perez concluded his email by stating, "Please let me know if you would like to continue the interactive dialogue on

your 2nd request." Dkt. 39-6 at 73–74 (Pl.'s SDMF ¶ 260); *see also* Dkt. 42-1 at 120 (Def.'s Response ¶ 260).

After receiving this email, Kennedy felt as though "no progress [was] being made." Dkt. 39-1 at 217 (Pl.'s Ex. 4, Kennedy Dep. at 201:18–203:6). She responded to Perez: "So overall nothing was accomplished in this week and [a] half to two weeks of my request." Dkt. 32-7 at 2 (Def.'s Ex. 106). Kennedy followed up with Perez later that day, however, writing: "I want you to also understand I am flexible and willing to work out a way on my end as well. Such as maybe having one day a week for sure of telework instead of multiple days randomly and maybe on the other days I have a flex schedule." Dkt. 39-6 at 76 (Pl.'s SDMF ¶ 269); *see also* Dkt. 42-1 at 123 (Def.'s Response ¶ 269). Kennedy was terminated three days later. As of Kennedy's termination on October 1, 2018, she did not have a desk closer to the restroom, nor had the FRA agreed to permit her to telework on days when her illness prevented her from traveling (according to Kennedy, the process of traveling exacerbated her nausea) to the office. Dkt. 39-6 at 79 (Pl.'s SDMF ¶ 282); Dkt. 42-1 at 128 (Def.'s Response ¶ 282).

**B.    Procedural Background**

On or about October 25, 2018, Kennedy contacted an EEO counselor to make a complaint. Dkt. 32-2 at 45 (Def.'s SUMF ¶ 153); *see also* Dkt. 39-7 at 49 (Pl.'s Response ¶ 153). On February 21, 2019, Kennedy filed a formal administrative complaint, and, on April 15, 2019, the Department's Office of Civil Rights accepted the complaint and referred the matter for investigation. Dkt. 32-2 at 45 (Def.'s SUMF ¶ 155); *see also* Dkt. 39-7 at 49 (Pl.'s Response ¶ 155).

On July 24, 2019, Kennedy filed suit in this Court against Dynamic-Pro, 19-2212 Dkt. 1, and on September 5, 2019, she filed suit against the Department, 19-2666 Dkt. 1. On December

13, 2019, the Court consolidated *Kennedy v. Dynamic-Pro, Inc.*, No. 19-cv-2212, and *Kennedy v. Chao*, No. 19-cv-2666, pursuant to Federal Rule of Civil Procedure 42(a).  The parties later stipulated to the dismissal of Dynamic-Pro, Inc., leaving the Secretary of Transportation as the only remaining defendant, Min. Order (04/26/2021), and, as noted above, Kennedy has dropped three of her claims against the Department.  As a result, all that remains are three claims against the Department: Count I, which alleges that Kennedy was subjected to a hostile work environment; Count II, which alleges that she was subject to retaliation for complaining about that hostile work environment and about related retaliatory action; and Count III, which alleges that the Department failed to accommodate her disability.

The Department now moves for summary judgment on the remaining counts, Dkt. 32, and Kennedy opposes that motion, Dkt. 39.

## II.  LEGAL STANDARD

Summary judgment is warranted if a party can "show[ ] that there is no genuine dispute as to any material fact and [that the party] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it could affect the outcome of the litigation under governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party, *see Scott v. Harris*, 550 U.S. 372, 380 (2007).  The Court must view the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in that party's favor. *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).

The party seeking summary judgment "bears the initial responsibility" of "identifying those portions" of the record that "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party carries this initial

burden, the burden then shifts to the nonmoving party to show that sufficient evidence exists for a reasonable jury to find in the nonmoving party's favor with respect to the "element[s] essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The nonmoving party's opposition, accordingly, must consist of more than unsupported allegations or denials, and must be supported by affidavits, declarations, or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324. That is, once the moving party carries its initial burden on summary judgment, the nonmoving party must provide evidence that would permit a reasonable jury to find in its favor. *See Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). If the nonmoving party's evidence is "merely colorable" or "not significantly probative," the Court should grant summary judgment. *Liberty Lobby*, 477 U.S. at 249–50.

### III.  ANALYSIS

The Department moves to dismiss each of Kennedy's three remaining claims on a variety of grounds. The Court will consider each claim, and the Department's corresponding arguments, in turn.

### A.    Hostile Work Environment Based on Gender

Kennedy first alleges that she suffered severe and pervasive sexual harassment from Marc Willis and that the Department failed to act when she brought this conduct to the attention of the Department's EEO office.

Title VII prohibits employers from "fail[ing] or refus[ing] to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e–2(a)(1). "When the workplace is permeated with discriminatory intimidation, ridicule,

and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) (quoting *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993)).  For obvious reasons, a claim of this type is referred to as a "hostile work environment" claim.  *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 754 (1998).

"To make a prima facie Title VII hostile environment claim, the plaintiff employee must show: (1) the employee was a member of a protected class; (2) the employee was subjected to unwelcome sexual harassment; (3) the harassment complained of was based upon sex; (4) the charged sexual harassment had the effect of unreasonably interfering with the plaintiff's work performance and creating an intimidating, hostile, or offensive working environment; and (5) the existence of respondeat superior liability." *Davis v. Coastal Int'l Sec., Inc.*, 275 F.3d 1119, 1122–23 (D.C. Cir. 2002) (internal quotation marks and citation omitted).  Here, viewing the evidence in the light most favorable to the nonmoving party, Kennedy easily clears the first three hurdles—she is a member of a protected class based on her gender; she was subjected to repeated, unwelcome sexual harassment; and that harassment was based on her sex.  The Department, instead, premises its motion on the fourth and fifth requirements, arguing (1) that even accepting Kennedy's allegations regarding Willis's conduct, that conduct was insufficiently severe or pervasive as to have affected the terms and conditions of her employment, and (2) that, in any event, the Department cannot be held responsible for what Willis said and did.  Dkt. 32-1 at 11–23.

1.     *Severe or Pervasive Harassment*

To prevail on a Title VII hostile work environment claim, the plaintiff must show that the workplace was "both objectively and subjectively offensive, one that a reasonable person would

find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). "To determine whether an environment is sufficiently hostile or abusive," courts must "'look[] at all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* at 787–88 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). "'Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview.'" *Oncale*, 523 U.S. at 81 (quoting *Harris*, 510 U.S. at 21).

As the D.C. Circuit has explained, "[s]everity and pervasiveness are complementary factors and often go hand-in-hand, but a hostile work environment claim could be satisfied with one or the other." *Brooks v. Grundmann*, 748 F.3d 1273, 1276 (D.C. Cir. 2014). "In discerning severity and pervasiveness," the Court must "assess the timeline of events as a whole" and must determine whether those events give rise to a hostile work environment. *Id.* "[T]he constituent acts of a hostile-work-environment claim," moreover, "must be 'adequately linked' to one another." *Baird v. Gotbaum (Baird II)*, 792 F.3d 166, 171 (D.C. Cir. 2015) (quoting *Baird v. Gotbaum (Baird I)*, 662 F.3d 1246, 1251 (D.C. Cir. 2011)).

Often, "a few isolated incidents of offensive conduct [will] not amount to actionable harassment." *Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C. Cir. 2002) (holding that a plaintiff could not prove prima facie case of sexual harassment where "claim amount[ed] to only one isolated incident of sexual harassment"); *see also Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 269 (2001) (no actionable harassment in case involving singular statement, "I hear making love to you is like making love to the Grand Canyon"); *Harris v. Wackenhut Servs.*, Inc., 419 F.

17

App'x 1, 1 (D.C. Cir. 2011) (holding that "three racially motivated comments directed at [the plaintiff] . . . do not amount to actionable harassment"). But, in unusual circumstances, a single, particularly severe incident might suffice. *See Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 577 (D.C. Cir. 2013).

Here, taking Kennedy's evidence as true and drawing all justifiable inferences in her favor, *see Tolan v. Cotton*, 572 U.S. 650, 651 (2014), the Court must consider whether the following incidents, which allegedly took place between October 2017 to July 2018, meet this burden:

- When Kennedy was leaving the office, she turned back to speak to a co-worker and saw Willis "just ogling [her] body, just, like, looking me up and down in a lusty, creepy way." When she returned, her co-worker Ashante Jorden told Kennedy that Willis "asked if [Kennedy] was a stripper because" of the size of her posterior. Dkt. 39-1 at 181 (Pl.'s Ex. 4, Kennedy Dep. at 57:19–58:4).

- On "at least five or six" occasions, Kennedy witnessed Willis ogling her body and "shaking his head and smiling." Dkt. 39-1 at 183–84 (Pl.'s Ex. 4, Kennedy Dep. at 68:16–69:20).

- When Kennedy was about to move to Government Affairs, Willis "kept coming up to [Kennedy] and telling [her] the whole week that [she] was getting ready to work for him and [she] was going to be his assistant. And he was saying it, like, every day." Dkt. 39-1 at 185 (Pl.'s Ex. 4, Kennedy Dep. at 74:11–15).

- Willis told Kennedy that "the only reason why . . . Hess wanted [Kennedy] to work for him was because of [her] looks." Dkt. 39-1 at 185 (Pl.'s Ex. 4, Kennedy Dep. at 74:20–75:8).

- "At one point [Willis] asked [Kennedy] for gum and said he might not know when [she] will want a kiss from him." Dkt. 39-1 at 184 (Pl.'s Ex. 4, Kennedy Dep. at 71:4–8). During that same interaction, Willis told Kennedy that "he was jealous of . . . the things on her neck and that he wasn't the one to give them to [her] or put them there," apparently referring to hickies. *Id.* at 186 (Pl.'s Ex. 4, Kennedy Dep. at 77:16–78:13).

- Willis told Kennedy "how nice [she] look[s] in [her] jeans on Fridays." Dkt. 39-1 at 185 (Pl.'s Ex. 4, Kennedy Dep. at 75:9–21).

- "[A]t the printer," Willis "asked to get in front of [Kennedy] because [she] had more documents to print th[a]n he had and [Kennedy] told him 'ok you can get in front of me but it may cost ya," which Kennedy said was stated in a "joking" and "non-sexual manner." Dkt. 39-1 at 184 (Pl.'s Ex. 4, Kennedy Dep. at 72:11–16). Willis then responded, "in a[n] uncomfortable way," that he was "willing to pay for certain things." *Id.* (Pl.'s Ex. 4, Kennedy Dep. at 72:16–19).

- Willis once told Kennedy that she was "pretty" and that "if he was [her] age he would date [her]." Dkt. 39-1 at 185 (Pl.'s Ex. 4, Kennedy Dep. at 75:11–76:7).

- While not in Kennedy's presence, Willis made a comment to her co-worker Antoinette Jensen about "being a dirty old man to the nurses and grabbing their butts," which Jensen relayed to Kennedy. Dkt. 39-1 at 185 (Pl.'s Ex. 4, Kennedy Dep. at 76:8–24).

- Around the holidays, after Kennedy left early for the day with Hess's permission, Willis texted Kennedy to tell her that she was "not supposed to" leave early because she was a contractor, and then said, "oh, well, we should go out for a drink." Dkt. 39-1 at 232 (Pl.'s Ex. 4, Kennedy Dep. at 262:8–263:7).

- Willis "came out of his office, and he told [her] that he liked [her] red bottoms," referring to her Christian Louboutin shoes. Dkt. 39-1 at 275 (Pl.'s Ex. 4, Kennedy Dep. at 275:14–23).

- Kennedy told Jensen that Willis "t[ells her she is] beautiful all the time." Dkt. 39-1 at 1573.

- "When [Kennedy] moved over to Government Affairs, [Willis] told [Kennedy] that Chris [Hess] doesn't need an assistant and that somebody will be let go, but he[]" would "make sure it's not" Kennedy, that she "will be working for [Willis]," and that "he had [her] back." Dkt. 39-1 at 234–35 (Pl.'s Ex. 4, Kennedy Dep. at 272:14–273:11).

Existing precedent does not draw clear lines between conduct that is "merely" offensive and conduct that is so offensive or pervasive that it "affect[s] the conditions of" the plaintiff's employment. *Harris*, 510 U.S. at 21. This Court has held, at times, that persistently asking the

plaintiff out, making "a litany of comments about [the plaintiff's] appearance and body," delaying the individual's entrance and exit, staring, and "undressing [the plaintiff] with his eyes," *Simms v. Ctr. For Corr. Health & Pol'y Stud.*, 794 F. Supp. 2d 173, 193 (D.D.C. 2011); making a sexual advance, the rejection of which may have cost the plaintiff a position at work, along with multiple instances of verbal and physical conduct in the preceding months, *Norris v. Washington Metro. Area Transit Auth.*, 342 F. Supp. 3d 97, 124–25 (D.D.C. 2018); and leaving "sexually offensive material . . . under plaintiff's toolbox and . . . regularly display[ing] sexually explicit materials . . . in [the plaintiff's] line of sight," *Whorton v. Washington Metro. Area Transit Auth.*, 924 F. Supp. 2d 334, 354 (D.D.C. 2013), can suffice to submit the question of harassment to a jury.  But the Court has also held that "unspecified compliments regarding [the plaintiff's] appearance, several inappropriate suggestive comments, and one sexually explicit remark," from one co-worker, and one isolated allegation of unwanted touching outside of the office by a different co-worker, *Bergbauer v. Mabus*, 934 F. Supp. 2d 55, 64–65, 76–78 (D.D.C. 2013); hugging the plaintiff, grabbing her buttocks, and attempting to kiss her, *Akonji v. Unity Healthcare, Inc*., 517 F. Supp. 2d 83, 88, 97–98 (D.D.C. 2007); or caressing the plaintiff on the knee, placing her breast on his arm, and placing her fingers on his buttocks, *Carter v. Greenspan*, 304 F. Supp. 2d 13, 25 (D.D.C. 2004), did not suffice.

In deciding whether a course of conduct is sufficiently severe or pervasive to support a hostile work environment claim, the Court must consider the totality of the circumstances, *Harris*, 510 U.S. at 23, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.*  "[O]ffhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the

20

'terms and conditions of employment.'"  *Faragher*, 524 U.S. at 788; *see also Harris*, 510 U.S. at 21 (the "'mere utterance of an . . . epithet which engenders offensive feelings in a[n] employee' does not sufficiently affect the conditions of employment") (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)).  But the jury will often be best situated to determine, after hearing all of the evidence, whether the misconduct "crossed the line between mere vulgarity . . . and offensive conduct that was sufficiently severe or pervasive to alter [the] conditions of employment."  *Estes v. Georgetown Univ.*, 231 F. Supp. 2d 279, 282 (D.D.C. 2002), *vacated pursuant to settlement* (Oct. 23, 2003).

This case lies very close to the line.  On the one hand, the conduct occurred repeatedly over a period of months, and, although no single episode was sufficiently severe to support a claim standing alone, *see Harris*, 510 U.S. at 21, one might reasonably argue that this course of demeaning conduct by a relatively senior government official directed at an administrative assistant would have left her (and possibly others) with a diminished sense of her worth in the workplace.  In other words, she was not treated as a co-worker but, rather, as someone valued only "because of [her] looks," Dkt. 39-1 at 185 (Pl.'s Ex. 4, Kennedy Dep. at 74:20–75:8), who easily could be fired because she was merely a contractor, and who was made to feel exceedingly uncomfortable and vulnerable.  But on the other hand, one can also argue that Kennedy did not work directly with Willis and was not subject to his supervision, no one with whom Kennedy worked engaged in any form of sexual harassment, and Willis's misconduct was (at least arguably) less sustained and severe than conduct that other decisions from this Court have treated as insufficient, in light of the high bar set by the governing Supreme Court and D.C. Circuit precedent.  This line-drawing exercise is further complicated by the fact that notions of whether particular workplace conduct is "objectively and subjectively offensive" and of a type "that a

reasonable person would find hostile or abusive," *Faragher*, 524 U.S. at 787, and conceptions of the "severity" of such misconduct, are not inherently static but, presumably, can evolve over time, rendering older precedent less helpful.

These are difficult questions.  But, for present purposes, the Court need not decide whether Willis's alleged conduct crossed the line from vulgar to "sufficiently severe or pervasive to alter [the] conditions of employment," *Estes*, 231 F. Supp. 2d at 282, because the Department's second argument is both more convincing and dispositive.

2.   *Employer Liability Standards*

The more straightforward path to victory for the Department lies in the employer liability standards that apply under Title VII.  For purposes of a hostile work environment claim, the question "[w]hether an employer may be held liable depends on whether a coworker or supervisor of the plaintiff perpetrated the harassment." *Leach v. Nat'l R.R. Passenger Corp.*, 128 F. Supp. 3d 146, 154 (D.D.C. 2015).  Where a coworker engages in harassment, the employer is liable only "if the employer was negligent with respect to the offensive behavior.'" *Vance v. Ball State Univ.*, 570 U.S. 421, 427 (2013).  Under controlling D.C. Circuit precedent, this means that "[a]n employer may be held liable for the harassment of one employee by a fellow employee (a non-supervisor) if the employer knew or should have known of the harassment and failed to implement prompt and appropriate corrective action." *Curry v. District of Columbia*, 195 F.3d 654, 660 (D.C. Cir. 1999).  But "where the harassing employee is the plaintiff's 'supervisor,'" "an employer may be *vicariously* liable for its employees' creation of a hostile work environment." *Vance*, 570 U.S. at 428.  "[A]n employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim." *Id.* at 424 (emphasis in original).  Those actions

22

include, without limitation, "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761; *see also Vance*, 570 U.S. at 431. For the reasons explained below, the Court concludes that no reasonable jury could find that Willis was Kennedy's "supervisor" or that the Department failed to take appropriate corrective action as soon as it learned of the harassment.

Although Kennedy maintains that Willis had actual supervisory authority over her, she has failed to proffer any competent evidence supporting that contention. She starts with the claim that "Willis told [her] on several occasions that he would have her transferred to become his assistant prior to her re-assignment to [the Office of the Administrator] and RFCO." Dkt. 39 at 31. The evidence that she cites for this, *id.*, however, does not show—and would not permit a reasonable jury to find—that Willis had any authority over Kennedy. Kennedy testified, for example, that before she was assigned to work for Hess, Willis (incorrectly) told her that she "was going to be his assistant." Dkt. 39-1 at 185 (Kennedy Dep. at 74:9–22). But that assertion says nothing about who had the *authority* to determine Kennedy's assignment, and, indeed, the fact that Kennedy was assigned to Hess, and not Willis, shows that Willis lacked that authority. Similarly, although Kennedy also testified that, in summer of 2018, she understood that Willis "put in a request" that she come to work for him, she acknowledged that she did not know to whom Willis made this request, and, in any event, there is no evidence that Kennedy ever, in fact, served as Willis's assistant. *Id.* at 234 (Kennedy Dep. at 272:8–273:11). Nor is there a trace of evidence that Willis ever gave her instructions, ever altered her responsibilities or benefits, or ever evaluated her work.

Kennedy also maintains that Willis "prevented [her] reassignment back to [the Office of the Administrator], as evidenced by his email exchange with Ms. O'Neal, wherein she gave him a 'heads up' that [DOT Contracting Officer Lee] Anderson was contemplating this move." Dkt. 39 at 31. She argues that "the transfer did not happen because Willis and O'Neal did not want it to happen." *Id.* at 32. Kennedy offers no evidence that either Willis or O'Neal had any such authority. Rather, she merely invokes a single email exchange in which O'Neal notified Willis about the possibility that Kennedy would be transferred back to the Office of the Administrator, and in which Willis responded, "I hope Becky [Pennington] talked him out of this" and thanked O'Neal "for the heads up." Dkt. 39-6 at 48 (SDMF ¶ 164) (alteration in original). Again, if anything, that email exchange shows that Willis lacked authority to take—or even to recommend—any employment action with respect to Kennedy; he was merely provided a "heads up."

In the alternative, Kennedy argues that, if "the Court find[s] that Willis did not have actual authority, the evidence demonstrates that he exercised *apparent* authority over Ms. Kennedy and the other contract employees." Dkt. 39 at 32 (emphasis added). For support, she points to *Ellerth*, where the Supreme Court observed that "[s]cope of employment does not define the only basis for employer liability under agency principles" and that, "[i]n limited circumstances, agency principles impose liability on employers even where employees commit torts outside the scope of employment." 524 U.S. at 758. Those circumstances include instances in which "'the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation.'" *Id.* (quoting Restatement (Second) of Agency § 219); *see also id.* at 759 ("As a general rule, apparent authority is relevant where the agent purports to exercise a power

24

which he or she does not have, as distinct from where the agent threatens to misuse actual power.").  The Supreme Court cautioned, however, that "[i]f, in the unusual case, it is alleged there is a false impression that the actor was a supervisor, when he in fact was not, the victim's mistaken conclusion *must be a reasonable one*."  *Id.* at 759 (emphasis added).

Here, no jury could find that Kennedy had a reasonable, mistaken belief that Willis was her supervisor.  When asked during her deposition, "Was Mr. Willis ever your direct supervisor," Kennedy answered, "Never."  Dkt. 39-1 at 171 (Pl.'s Ex. 4, Kennedy Dep. at 19:21–22).  And when asked, "Did Mr. Willis ever have any supervisory authority over you," Kennedy responded, "Not from my understanding."  Dkt. 39-1 at 171 (Pl.'s Ex. 4, Kennedy Dep. at 19:23–25).  Kennedy, nonetheless, argues that Willis possessed apparent authority to act as her supervisor because, in her view, "Willis overrode Hess's instructions allowing [her] to leave early around the Thanksgiving holiday."  Dkt. 39 at 32.  But, even accepting Kennedy's deposition testimony as true, that vastly overstates what she said.

Her relevant testimony is as follows:

Q.  And was there any instances that you can recall in which Mr. Willis tried to exercise his authority to let you know that he had authority over you?

A. Yes.  And in the Administrator's Office he would always say how contractors are at will and that we don't have the same rights as federal workers, and he would constantly talk about that and how -- in addition to me knowing that he had gotten a young lady fired, so --

Q.  Okay.  Was there ever an instance where Mr. Willis indicated that your COR was looking for you?

A.  Yes. When I moved over to Government Affairs, it was during -- it was around the holidays and I was under Chris Hess.  Chris had come out of his office and was putting his backpack on, and he was like, what are you still doing here?  It's the holidays; go home.  And I was like, really?  And he was like, yes, go home.  And so I packed my stuff up, I went and said bye to everybody, and I left.  And a little bit after I got in the house, Ashante Jorden reaches out to me and told me that Marc was looking for me.  And she said that he had asked for

> my number, but she didn't want to give it to him, so she took his number.  She
> said that -- here goes his number; I don't know; he was looking for you; it
> seemed urgent. So I texted Marc and said, hey, I heard you were looking for me;
> is there something I can help you with?  And he wrote back and said, yeah,
> MaryAnne was looking for you.  And I thought that was kind of odd because
> MaryAnne never comes in the Government Affairs Office, but if he said it, I just
> believed him.  And he said -- I said, oh, well, Chris had said I can leave early.
> He was like, no, you're not supposed to do that; you're a contractor.  And I was
> like, oh, well, I didn't know; Chris said I could go, and he's my supervisor.  And
> he said, oh, well, we should go out for a drink.  And then I had told him I'm an
> extremely busy person.  And he just said okay.

Dkt. 39-1 at 232 (Kennedy Dep. at 261:23–263:7).

Although this exchange is arguably another arrow in Kennedy's quiver of complaints about Willis's harassment, no reasonable person would come away from it with the belief that Willis was her *de facto* supervisor or that he had any authority relating to her employment. Indeed, when Kennedy answered Willis's scolding by telling him that Hess was her supervisor, and he said that she could go, Willis did not push back and, instead, invited Willis out for a drink.  In any event, even if obnoxious, there is no reason why one co-worker cannot tell another co-worker that she has broken a rule.  What matters is whether the officious co-worker had the authority—or even the apparent authority—to *set* the rules or to *do anything* in response to a breach of those rules.  Asking a co-worker out for a drink falls well beyond the types of employment actions one might reasonably expect a supervisor to take.  *See Vance*, 570 U.S. at 432 (rejecting the notion that a supervisor includes those who "have the ability to direct a co-worker's labor to some ill-defined degree").

Nor is the Court persuaded by Kennedy's argument that "[i]t was well known that Willis had recently effectuated the removal of another [Dynamic-Pro] contract employee who complained about him," leaving her with the reasonable belief that he was her supervisor.  Dkt. 39 at 32.  Simply put, an unsubstantiated rumor that Willis had someone else fired says nothing

about his authority—or apparent authority—over Kennedy.  And, for similar reasons, Kennedy's contention that Willis "repeatedly reinforced to [her] and the other contractors that they had less rights than regular federal employees and were easier to terminate," Dkt. 39 at 32, does little to advance her cause.  Even if Willis told the contractors that they had fewer rights or that they were at-will employees—and even if he was a bully—that does not mean that *Willis* could fire Kennedy at will.

The Court, accordingly, concludes that no reasonable jury could find that Willis was Kennedy's actual or apparent supervisor.  This, then, leaves only the question of whether there is any evidence that would permit a reasonable jury to find that the Department "was negligent with respect to the offensive behavior." *Vance*, 570 U.S. at 427.  "An employer is negligent with respect to sexual harassment if it knew or should have known about the conduct and failed to stop it." *Ellerth*, 524 U.S. at 759.  Neither Kennedy's complaint nor her opposition to the Department's motion contains any argument or evidence that the Department was negligent.[2] That omission is unsurprising given the undisputed facts: the parties agree that after Kennedy reported Willis's behavior to the Department, the Department promptly spoke to Willis, and the harassment stopped.  *See* Dkt. 32-2 at 17 (Def.'s SUMF ¶ 53); *see also* Dkt. 39-7 at 18 (Pl.'s Response ¶ 53).  Nor does Kennedy even argue that the Department should have known about the conduct at some earlier point in time and failed to stop it then; to the contrary, she testified that most of Willis's harassment occurred when no one else was present, Dkt. 39-1 at 234 (Pl.'s Ex. 4, Kennedy Dep. at 269:6–9).

---

[2] Although Kennedy argues at length, in the context of the *Faragher/Ellerth* affirmative defense to vicarious liability, that the Department's investigation into Willis was flawed, she never puts forward a negligence theory of liability; instead, she relies exclusively on a vicarious liability theory.

For these reasons, the Court will grant summary judgment in favor of the Department on Count I of Kennedy's complaint.

## B.    Retaliatory Hostile Work Environment and Termination

Count II of Kennedy's complaint alleges that the Department subjected her to two types of retaliation for complaining to the Department's EEO office about Willis and O'Neal:  First, she was allegedly subjected to "a hostile work environment based on [her] protected activity." 19-2666 Dkt. 1 at 18 (Compl. ¶ 70).  Second, she was allegedly terminated in retaliation for that EEO activity.[3]  *Id.* (Compl. ¶ 71).  As explained below, the Department is entitled to summary judgment with respect to the first of these theories of relief but not as to the second.

It is unlawful under Title VII for an employer "to discriminate against any of [its] employees . . . because [she] has made a charge . . . or participated in any manner in an investigation" of discrimination.  42 U.S.C. § 2000e–3(a); *see Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006) ("general ban on retaliation in § 2000e–3(a)" applies to federal employers through § 2000e–16).  Thus, to prevail on a Title VII retaliation claim, a plaintiff must prove that she suffered an adverse employment action "because" she engaged in protected EEO

---

[3] The complaint alleges that "Plaintiff engaged in various forms of protected activity including her complaints to the EEO regarding Willis's conduct and O'Neal's retaliation, request for a reasonable accommodation from Defendant and when she complained to Defendant's EEO in August of 2018 that Defendant was failing to act on her request for a reasonable accommodation."  19-2666 Dkt. 1 at 18 (Compl. ¶ 69).  In her opposition to summary judgment, however, Kennedy withdrew her claim that she was subject to retaliation for requesting a reasonable accommodation; she now focuses exclusively on her claim that she was subjected to retaliation for complaining about Willis and O'Neal.  Dkt. 29 at 8.  The Court will, therefore, **GRANT** the Department's motion as conceded with respect to Kennedy's claim that she was subjected to retaliation for making a reasonable accommodation request.

activity and that her employer acted with "the intent or motive to retaliate." *Mitchell v. Baldrige*, 759 F.2d 80, 66 (D.C. Cir. 1985).

Absent direct evidence of retaliatory intent, courts evaluate Title VII cases—including retaliation cases—under the burden-shifting analysis adopted in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Taylor v. Solis*, 571 F.3d 1313, 1320 (D.C. Cir. 2009).  The plaintiff must first establish the prima facie case of retaliation.  *Id.* at 1320 n.*.  As the D.C. Circuit has explained:

> In order to establish a prima facie case of retaliation, a plaintiff must show: 1) that she engaged in a statutorily protected activity; 2) that the employer took an adverse personnel action; and 3) that a causal connection existed between the two.  As in a case of disparate treatment, this initial burden is not great.  Plaintiff merely needs to establish facts adequate to permit an inference of retaliatory motive.

*Mitchell*, 759 F.2d at 66.  If the plaintiff carries this initial burden, the burden then shifts to the employer to offer a legitimate, nonretaliatory reason for its action.  *Id.*  But if the employer carries that burden, "the court 'need not—and should not—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*,'" and, instead, "should proceed to the question of retaliation vel non."  *Taylor*, 571 F.3d at 1320 n.* (quoting *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (disparate treatment claim); *Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009) (retaliation claim)).  "At that stage, the only question is whether the employee's evidence creates a material dispute on the ultimate issue of retaliation either directly by [showing] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  *Jones*, 557 F.3d at 679 (cleaned up).

Here, the Department concedes that Kennedy engaged in two instances of protected EEO activity: (1) her July 20, 2018 complaint to Whiting regarding Willis's sexual harassment; and

(2) her August 30, 2018 complaint to Whiting regarding Willis's and O'Neal's retaliation against her. *See* Dkt. 32-1 at 25.  The Department also concedes that Kennedy's termination qualifies as an adverse employment action.  It disputes, however, whether Kennedy has offered evidence sufficient to permit a reasonable jury to find (1) that she was subjected to a retaliatory hostile work environment or (2) that she was terminated because she engaged in that protected activity. The first defense applies only to Kennedy's retaliatory work environment claim, while the second applies most aptly to her retaliatory termination claim.

Because the analysis relevant to these defenses differs, the Court will consider each in turn.

1.   *Retaliatory Hostile Work Environment*

Courts "have recognized a special type of retaliation claim based on a 'hostile work environment.'"  *Baird II*, 792 F.3d at 168.  "A hostile [work] environment [claim] consists of several individual acts that 'may not be actionable on [their] own' but become actionable due to their 'cumulative effect.'"  *Id.* (third alteration in original) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002)).  "The constituent acts must be 'adequately linked' such that they form 'a coherent hostile environment claim.'"  *Id.* (quoting *Baird I*, 662 F.3d at 1251 ). "In addition, [these] acts must be 'of such severity and pervasiveness as to alter the conditions of . . . employment and create an abusive working environment.'"  *Id.* at 169 (quoting *Hussain v. Nicholson*, 435 F.3d 359, 366 (D.C. Cir. 2006)).  As in the context of a hostile work environment based on gender, "[s]everity and pervasiveness are determined by reference to 'all the circumstances,' including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  *Id.* (quoting *Harris*, 510 U.S. at 23).

30

Here, the Department argues that Kennedy's retaliatory hostile work environment claim fails because the allegedly hostile acts that she has identified are insufficiently severe or pervasive. Dkt. 32-1 at 28–29. To evaluate that contention, the Court begins by outlining the incidents that Kennedy invokes in support of her claim:

- Willis and O'Neal would walk past her and laugh. Dkt. 39-1 at 199 (Kennedy Dep. at 131:3–13).

- On August 9, O'Neal met with Noah to discuss Kennedy's alleged performance deficiencies, including Kennedy's tardiness and her failure to send email acknowledgments to work requests. Dkt. 39-6 at 35 (Pl.'s SDMF ¶¶ 116–20).

- On August 20, O'Neal met with Noah and claimed that Kennedy continued to exhibit performance difficulties, including that Kennedy would fail to update leadership on the status of her tasks. Dkt. 39-6 at 35 (Pl.'s SDMF ¶ 136).

- On August 30, 2018, Kennedy met with Perez to discuss the PIP. Dkt. 39-6 at 56 (Pl.'s SDMF ¶ 193).

- O'Neal complained that Kennedy spent too much time in the bathroom, despite O'Neal's awareness that Kennedy was suffering from hyperemesis gravidarum. *See* Dkt. 39-6 at 57 (Pl.'s SDMF ¶ 200).

- O'Neal unreasonably delayed action on Kennedy's request for a desk closer to the bathroom. *See, e.g.*, Dkt. 39-6 at 54, 67, 79 (Pl.'s SDMF ¶¶ 186, 235, 282).

- O'Neal denied Kennedy's request to telework and terminated the interactive process. *See, e.g.*, Dkt. 39-6 at 69–74 (Pl.'s SDMF ¶¶ 242–61).

- O'Neal instructed Kennedy to order more calendars than had been requested, causing the purchase to be over what the funds administrator had approved. Dkt. 39-6 at 60–61 (Pl.'s SDMF ¶ 213).

- O'Neal prevented Kennedy from accessing training on FRA's acquisition system, PRISM. Dkt. 39-6 at 61, 63 (Pl.'s SDMF ¶¶ 215, 222).

Even if Kennedy could establish each of the incidents at trial, no reasonable jury could find that they established a hostile work environment. To prevail on a claim of a retaliatory

hostile work environment, Kennedy "must show that the [Department] subjected h[er] to 'discriminatory intimidation, ridicule, and insult' of such 'severity or pervasiveness as to alter the conditions of [her] employment and create an abusive working environment.'" *Hussain v. Nicholson*, 435 F.3d 359, 366 (D.C. Cir. 2006) (quoting *Harris*, 510 U.S. at 17, 21–22). But simply experiencing adverse and allegedly retaliatory "'work-related actions by supervisors' acting within the scope of their official duties"—however objectionable that might be, and however actionable under discrete disparate treatment theories—does not mean that the employee was subjected to a hostile work environment. *Fields v. Vilsack*, 207 F. Supp. 3d 80, 95 (quoting *Grosdidier v. Chairman, Broad. Bd. Of Governors*, 774 F. Supp. 2d 76, 110–11 (D.D.C. 2011)); *Aldrich v. Burwell*, 197 F. Supp. 3d 124, 138 (D.D.C. 2016) ("[C]ourts typically do not find . . . work-related actions by supervisors to be sufficient for a hostile work environment claim." (internal quotation marks omitted)). Rather, the "nature of a hostile work environment claim" is distinct, *Grosdidier v. Chairman, Board of Governors*, 774 F. Supp. 2d 76, 110 (D.D.C. 2011), and it requires "an abusive working environment" distinct from the usual prevails—whether justified or not—of workplace evaluation, feedback, and opportunity, *Baloch*, 550 F.3d at 1201. To hold otherwise would blur the distinction between "discrete disparate treatment claims and hostile work environment claims" and risks transforming "virtually every discrimination or retaliation case involving more than one challenged action into a hostile work environment claim.'" *Bain v. Office of the Attorney General*, --- F. Supp.3d ---, 2022 WL 19904236, at * 25 (D.D.C. Dec. 21, 2022) (quoting *Fields*, 207 F. Supp. 3d at 95).

Here, the vast majority of the allegedly harassing acts that Kennedy identifies fall into this camp. She contends that her supervisors unfairly concluded that her performance was deficient, unfairly criticized her work and attendance, and unfairly placed her on a PIP. But even

drawing all inferences in Kennedy's favor, as the Court must do at this stage of the proceeding, no reasonable jury could find that these incidents rise to the level of "intimidation" "ridicule" or "insult" of such severity or pervasiveness to have rendered her workplace "abusive."  *Meritor Sav. Bank, FSB*, 477 U.S. at 65; *Harris*, 510 U.S. at 21.  Nor are Kennedy's allegations that Willis and O'Neal seemed to be laughing at her and that O'Neal was insensitive to her difficult pregnancy sufficient to clear the high hurdle of establishing an "objectively" hostile work environment.  *See Baird II*, 792 F.3d at 172.  Indeed, the allegedly retaliatory harassment that Kennedy identifies is, if anything, less severe or pervasive than conduct the Court has previously held "fail[s]" to amount to a retaliatory hostile work environment.  *Hussain*, 435 F.3d at 366–67 (poor performance evaluations, termination threats, and heightened monitoring by supervisors did not amount to a retaliatory hostile work environment); *Husain v. Barsa*, No. CV 15-708 (RDM), 2021 WL 663206, at *13 (D.D.C. Feb. 19, 2021) ("[R]equiring that an employee provide reports regarding her day's activities while teleworking, requiring the employee to obtain authorization before appearing at an event (during the workday) to discuss government hiring, failing to provide the employee with unspecified training opportunities, and delaying the completion of evaluations or work plans does not come close to satisfying the 'demanding' standard for a hostile work environment claim."); *Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 94 (D.D.C. 2009) ("[R]emoval of important assignments, lowered performance evaluations, and close scrutiny of assignments by management" does not "sufficiently demonstrate a significant level of offensiveness.").

In Kennedy's view, the list of hostile acts set forth above fails to capture the severity and pervasiveness of the harassment she suffered because it omits Willis's conduct; as she sees things, the Court must consider O'Neal's retaliatory actions *and* Willis's sexual harassment as

one continuous, uninterrupted hostile work environment.  *See* Dkt. 39 at 40 n.6; *see also id.* at

26–30.  The caselaw on which Kennedy relies, however, is principally about a different issue—

whether certain acts are time-barred depending on whether they are part of a single, ongoing

hostile work environment.  *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122

(2002); *Vickers v. Powell*, 493 F.3d 186, 198–99 (D.C. Cir. 2007).  This case, in contrast, poses

the question whether hostile or offensive acts that *preceded* the date on which a plaintiff engaged

in any protected EEO activity—and that were not engaged in for any retaliatory purpose or in

anticipation of the protected activity—can contribute to any allegedly retaliatory, hostile work

environment.  The answer to that question can be found in the statutory text.  Title VII prohibits

an employer from discriminating against an employee—including by creating or tolerating a

hostile work environment—"because" the employee has engaged in protected EEO activity.  42

U.S.C. § 2000e–3(a).

Here, Kennedy does not allege—nor could she allege—that any of Willis's alleged

misconduct was the product of any retaliatory animus (the alleged misconduct occurred *before*

the alleged protected activity) and, thus, she cannot plausibly maintain that those acts of

harassment were taken "because" of Kennedy's *subsequent* EEO complaints.  *See Ricci v. Kerry*,

No. CV 11-2185 (RLW), 2013 WL 5329049, at *5 (D.D.C. Sept. 23, 2013) ("[T]he Court must

exclude from consideration those challenged acts that 'lack a linkage' to [the plaintiff's]

protected activity.") (internal citation omitted); *see also Morgan*, 536 U.S. at 118 ("[I]f an act on

day 401 had no relation to the acts between days 1-100, or for some other reason, such as certain

intervening action by the employer, was no longer part of the same hostile environment claim,

then the employee cannot recover for the previous acts."); *Alvarado v. Donahoe*, 687 F.3d 453,

459 (1st Cir. 2012) ("Speaking commonsensically, our cases have in the past explained that, to

successfully establish a claim of unlawful retaliation there must be, at a minimum, competent evidence that the alleged retaliators *knew* of the plaintiff's protected activity and that a retaliatory motive played a part in the adverse employment actions alleged.") (cleaned up) (emphasis in original) (internal citation and quotation marks omitted).  Absent any evidence that Willis's actions were taken for retaliatory purposes—or explanation for how they set the stage for *O'Neal's* alleged harassment in a manner that made *what she did* sufficiently severe to alter the conditions of Kennedy's employment—Willis's conduct has no bearing on whether Kennedy was subjected to retaliation "because" of her protected EEO activity.

The Court will, accordingly, grant summary judgment in favor of the Department with respect to Kennedy's claim that she was subjected to a hostile work environment because she engaged in protected EEO activity.

2.    *Retaliatory Removal/Termination*

Kennedy also alleges that her removal and termination were the result of retaliation.  The Department responds that Kennedy cannot make out a *prima facie* retaliation claim, Dkt. 32-1 at 26-29, and that, in any event, it had legitimate, non-pretextual business reasons for requesting that Dynamic-Pro remove her from the contract, *id.* at 29–39.

As explained above, "where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*."  *Brady*, 520 F.3d at 494 (emphasis in original).  Instead, the Court must move on to consider the ultimate question in the case; that is, has the plaintiff presented evidence sufficient to permit a reasonable jury to find that the proffered rationale is pretextual and that the employer, in fact, intentionally discriminated against the employee

because of her race, religion, sex, national origin, or protected EEO activity. *Id.* To be sure, under *Figueroa v. Pompeo*, 923 F.3d 1078 (D.C. Cir. 2019), "the *Brady* shortcut applies only if" the employer offers competent evidence in support of its legitimate, nondiscriminatory rationale defense; that evidence is sufficient to permit a reasonable jury to find that the employer was motivated by the nondiscriminatory rationale; the proffered rationale is "facially 'credible' in light of the proffered evidence;" and the evidence "present[s] a 'clear and reasonably specific explanation." *Id.* at 1088; *see also Kirkland v. McAleenan*, No. CV 13-194 (RDM), 2019 WL 7067046, at *14 (D.D.C. Dec. 23, 2019). But, here, Kennedy concedes that the Department has met its burden under *Figueroa*, and thus goes straight to the question of pretext. See Dkt. 39 at 46.

According to the Department, the FRA requested that Dynamic-Pro remove Kennedy from the contract because her performance was subpar, and it points to ample evidence to shift the burden back to Kennedy to show that this stated reason was pretextual and that, in fact, she was removed and terminated in retaliation for complaining about Willis and, then later, about Willis and O'Neal. The Department, for example, offers Noah's notes from the August 9 meeting, reflecting that Noah "spoke with [Kennedy] about her tardiness" and "about sending email acknowledgements for requests from leadership." Dkt. 32-7 at 250 (Def.'s Ex. 119). Noah also testified at deposition that Kennedy "would take a long time to get tasks done" and that, when "she did get them done, she would not communicate well from what I've heard with the FRA staff, [and] she wouldn't communicate well with me as an HR manager." Dkt. 32-4 at 772–73 (Noah Dep. at 61:21–62:7).[4] When asked whether Kennedy "was performing the work

---

[4] The Court notes that some of the evidence in support of the Department's legitimate, nonretaliatory reason may be inadmissible hearsay. For example, Noah's testimony that she

that was required of her as an Admin II at FRA," Noah responded, "No."  Dkt. 32-4 at 774

(Noah Dep. at 63:2–6).

Pennington, the FRA's CFO, attested that O'Neal and others "raised concerns and

complaints [about] Kennedy's work performance," including her "lack of initiative, lack of

attention to detail, and inability to follow-up on assignments."  Dkt. 32-4 at 2128 (Pennington

Decl. ¶ 7).  She further attests that Kennedy "could not complete simple tasks, such as updating

the [Office] calendar and making photocopies," "did not properly maintain the [Office] master

calendar[,]" "failed to acknowledge emails and assignments she received, which caused

confusion as to whether she had completed the assignment[,]" and that her "attitude at work was

off-putting and her body language discouraged people from approaching her and giving her

assignments or asking her work questions."  Dkt. 32-4 at 2128–30 (Pennington Decl. ¶¶ 8–11).

O'Neal makes similar claims in her declaration and also asserts that "Kennedy was

infrequently at her desk when [Staff Directors] went to give her assignments."  Dkt. 32-4 at

1694–96 (Declaration of Yulita O'Neal ¶¶ 8–9, 12).  In a mid-August email to Anderson, O'Neal

laid out her asserted reasons for requesting Kennedy's removal, including that she "ha[d] been

out of the office a lot, as well as continually late to work on a daily basis," and "ha[d] been given

a few tasks for her position however, she seems quite overwhelmed with the workload and ha[d]

expressed this to [O'Neal] on numerous occasions."  Dkt. 32-7 at 260–61 (Def.'s Ex. 122).  She

---

heard from FRA staff that Kennedy was a poor communicator is apparently hearsay.  But that
does not necessarily mean that the evidence carries no weight; even if the evidence might not be
offered for the truth of the matter asserted—that is, that Kennedy was a poor communicator—it
might nonetheless show that the FRA acted for nondiscriminatory reasons, removing Plaintiff
from the contract because the senior staff believed (based on the hearsay) that Kennedy was a
poor communicator.

further posited that Kennedy had difficulty "[p]rioritizing her workload" and was unable "to pay attention to details." Dkt. 32-5 at 463 (Def.'s Ex. 56).

Under the contract between the Department and Dynamic-Pro, someone in Kennedy's role, among other things, was supposed to "[a]rrange for meetings/conferences, including such matters as location, making reservation[s] for room, schedule, agenda, and notifying all participants as requested by staff[,]" "[s]chedule, coordinate, and compile logistics and materials for briefings/meetings[,]" "[m]aintain files," "[r]eceive visitors and telephone callers[,]" perform "[d]ata entry" and "fil[e] paperwork[,]" and perform other similar administrative tasks. Dkt. 32-4 at 2165 (Def.'s Ex. 27). Based on the evidence in the record, a reasonable jury could find that tardiness, inattention to detail, failure to keep up with the office calendar, failure to respond to task requests by superiors, an inability to prioritize work, a poor attitude, and an inability to perform simple tasks like photocopying are all legitimate reasons to request the removal of someone in that kind of administrative role.

The Department has, accordingly, carried it burden of proffering a legitimate, nondiscriminatory reason for requesting that Dynamic-Pro remove Kennedy from the contract, and that rationale is supported by competent evidence that is "facially credible" and "reasonably specific." *Figueroa*, 557 F.3d at 1088 (internal quotation marks omitted). As a result, the burden shifts to Kennedy to offer evidence that would permit a reasonable jury to find that this rationale is pretextual and that the real reason that O'Neal (and perhaps others) pushed for her removal was retaliatory. As explained below, this poses a close question, but the Court is ultimately persuaded that Kennedy has offered sufficient evidence to go a jury.

At the *prima facie* stage, a plaintiff can meet her "burden to show a causal connection by showing that 'the employer had knowledge of the employee's protected activity and the adverse

personnel action took place shortly after that activity." *Bergbauer v. Mabus*, 934 F. Supp. 2d 55, 83 (D.D.C. 2013) (quoting *Mitchell v. Baldridge*, 759 F.2d 80, 86 (D.C. Cir. 1985)) (cleaned up). At that *prima facie* stage, a plaintiff need not "provide direct evidence that his supervisors knew of his protected activity;" it is enough that the employer knew and that the adverse action took place shortly after the protected activity. *Jones*, 557 F.3d at 679. But "[o]nce the employer proffers a non-retaliatory explanation for the adverse employment action," "[m]ere temporal proximity is not sufficient to support" a finding of retaliation. *Iyoha v. Architect of the Capitol*, 927 F.3d 561, 574 (D.C. Cir. 2019). Otherwise, engaging in "protected activities would effectively grant employees a period of immunity, during which no act, however egregious, would support summary judgment for the employer in a subsequent retaliation claim." *Id.* (internal citation and quotation marks omitted). At this stage of the process, the employee must, accordingly, offer "evidence beyond mere proximity . . . to defeat the presumption that the proffered explanations for the adverse employment action are genuine." *Id.* (cleaned up) (internal citation and quotation marks omitted).

In *Iyoha v. Architect of the Capitol*, the D.C. Circuit held that the plaintiff had failed to proffer sufficient evidence of retaliation to survive the defendant's motion for summary judgment. *Id.* In that case, the plaintiff cited an "email by a supervisor," noting "that Iyoha had filed a workplace harassment complaint." *Id.* But, as the D.C. Circuit observed, "[t]he supervisor played no role in the 2014 or 2015 hiring processes" challenged in the lawsuit, "and the email d[id] not relate to either." *Id.* And, of course, "merely noting that an employee has engaged in protected activity does not, without more, raise an inference of retaliation." *Id.* Similarly, in *Dodson v. United States Capitol Police*, No. CV 18-2680 (RDM), 2022 WL 4598575, at *18 (D.D.C. Sept. 30, 2022), this Court concluded that the plaintiff failed to proffer

sufficient evidence that the employer's "decisions were motivated by a desire to retaliate against him."  Importantly, there was "no evidence" that the officer who took the plaintiff's complaint "ever told the officers involved in [his] disciplinary proceeding that [he] had complained to her." *Id.*

Here, the parties present starkly different theories of the case, neither of which finds conclusive proof in the evidence currently before the Court.  On the Department's telling, O'Neal—who Kennedy accuses of orchestrating her removal—had no motive to punish Kennedy.  Willis was not a close friend of hers, and, in any event, she did not know that Kennedy had complained about Willis on July 20, 2018 or had complained about her and Willis on August 30, 2018, before the FRA formally requested that Dynamic-Pro remove Kennedy from the contract.  Instead, O'Neal was motivated by Kennedy's poor performance.  O'Neal was not alone, moreover, in criticizing Kennedy's performance.  Pennington testified at deposition, for example, that Kennedy was "given many chances on-site to do minimal tasks correctly and that didn't happen."  Dkt. 32-4 at 921–22 (Pennington Dep. at 118:21–119:3).  And Tiwalde Bello, an accounting officer with the FRA, testified that Kennedy did a poor job of assembling a binder of materials for her, Dkt. 32-7 at 149–50 (Bello Dep. at 33:17–34:2), and failed properly to maintain the office calendar, *id.* at 157 (Bello Dep. at 41:7–22).  There is also evidence that Kennedy struggled with RCFO's procurement management system, known as PRISM.  Dkt. 32-4 at 1694-95 (O'Neal Decl. ¶ 8).  In short, in the Department's view, there is overwhelming evidence that Kennedy was not up to the tasks she was required to perform, and no evidence that the concerns that O'Neal and others expressed to Dynamic-Pro were based on retaliatory animus.

Unsurprisingly, Kennedy takes a very different view of the evidence.  In her view, O'Neal and Willis were friends—or they were at least close professional colleagues—and

O'Neal took offense when Kennedy complained about Willis's alleged misconduct. Dkt. 39-1 at 198 (Pl. Ex. 4, Kennedy Dep. at 126:11–128:22). Although O'Neal denies that she knew about Kennedy's complaint before she urged the FRA contracting officer to demand that Dynamic-Pro remove Kennedy from the contract, as explained, there is some evidence that she knew. For example, as soon as Kennedy complained about Willis, O'Neal's relationship with Kennedy soured—and it soured in a highly suspicious manner. *Id.* (Pl.'s Ex. 4, Kennedy Dep. at 127:3–18). Within a few weeks of her arriving at RCFO, O'Neal already purported to conclude that Kennedy could not do the job, and she recommended Kennedy's removal with remarkable (and suspicious) speed. *See* Dkt. 39-6 at 40–41 (Pl.'s SDMF at ¶¶ 141–43). When Willis and O'Neal would pass Kennedy in the hallway, "they would look directly at" her and laugh, Dkt. 39-1 at 199 (Pl.'s Ex. 4, Kennedy Dep. at 131:3–13), and, more importantly, O'Neal seems to have opposed Kennedy's return to work for Hess in the Government Affairs Office, even though Hess welcomed her return, Dkt. 39-6 at 44–48 (Pl.'s SDMF at ¶¶ 151–61). Then, according to Kennedy, O'Neal quickly agreed to place Kennedy on a PIP within RCFO, so that she could maintain control over Kennedy's destiny. *Id.* at 46–47 (Pl.'s SDMF at ¶¶ 159–60). But O'Neal never intended to provide Kennedy with a chance to prove herself; she ignored improvements in Kennedy's performance, and, indeed, prepared an email recommending her removal just two weeks into the 30-day PIP period. *Id.* at 39–40, 59 (Pl.'s SDMF at ¶¶ 134–39, 206).

It bears emphasis that, for present purposes, the Court is not the trier of fact; the Court's task is limited to deciding whether there is sufficient evidence of pretext and retaliatory purpose to permit a jury to make its own assessment of the evidence. Applying that standard, and

recognizing that the question is nonetheless a close one, the Court is unpersuaded that it can—or should—dispose of the question on summary judgment.

To start, there is substantial evidence supporting the Department's contention that O'Neal did not know about Kennedy's protected EEO activity at the time she allegedly prompted Kennedy's removal, and lack of knowledge that the plaintiff engaged in protected activity is, of course, highly probative against a finding of pretext. *Dodson*, 2022 WL 4598575, at *18.   But "[t]o survive summary judgment" a plaintiff need not proffer "direct evidence that his supervisors knew of his protected activity; he need only offer circumstantial evidence that could reasonably support an inference that they did," *Jones*, 557 F.3d at 679, and, here, Kennedy points to some circumstantial evidence that O'Neal knew.  For one thing, Kennedy testified that her relationship with O'Neal cooled immediately after Kennedy complained about Willis's conduct—and it cooled in a manner that a reasonable jury might find suspicious, given the fact that Kennedy was suffering from a difficult pregnancy and was new to RCFO but was given very little time to learn the ropes or to improve her performance.  Moreover, although far from conclusive evidence, a reasonably jury might place some weight on Pennington's concession that it is "possible" that she heard about Kennedy's accusations against Willis from O'Neal, although she could not recall how she heard.  Dkt. 39-1 at 800–01 (Pennington Dep. at 227:4–228:15); *see also* Dkt. 39-3 at 36–37 (Alvarenga Dep. at 20:17–21:1).

If this was all the evidence that Kennedy could muster, the Court might well conclude that no reasonable jury could find that O'Neal knew about Kennedy's complaint about Willis before she urged Kennedy's removal.  One additional piece of evidence, however, tilts the scales sufficiently in Kennedy's favor to give the Court pause.  On September 11, 2018, O'Neal sent Willis an email chain addressing what the FRA should do about Kennedy.  The email chain starts

in late August with the FRA contracting officer, Lee Anderson, expressing concern that the FRA had not provided Dynamic-Pro with feedback about Kennedy's performance and an opportunity "to correct [her] performance."  Dkt. 39-3 at 155 (Pl.'s Ex. 56).  Later that same day, Anderson emails O'Neal suggesting three options: (1) "Get rid of [Kennedy];" (2) "Keep [her] in RCFO;" or (3) "Move [her back] to ROA," where she had worked for Hess.  *Id.* at 154 (Pl.'s Ex. 56). O'Neal, in turn, favored option two but with a PIP, prompting Anderson to reply: "But yesterday we wanted to fire her . . . and we knew [that Dynamic-Pro] had a plan for corrective action at that point already."  *Id.* at 152 (Pl.'s Ex. 56).

It is at this point in the chain that O'Neal adds Willis and drops Anderson (and another FRA employee).  She writes: "Marc, Please see Lee's email below where he mentioned moving [Kennedy back] to ROA."  *Id.*  Willis, then, responds, "I hope [Pennington] talked him out of this," *id.* at 151 (Pl.'s Ex. 56), and O'Neal tells him, "I don't know[,] however, just wanted to make you aware," *id.*  The email chain ends with Willis saying, "Thanks for the heads up."  *Id.*

Kennedy argues that this email chain shows that O'Neal and Willis were, in fact, close; that O'Neal was watching out for him; and that neither O'Neal nor Willis wanted Kennedy to return to work for Hess, which would put her, once again, in proximity to Willis.  There is evidence, moreover, that Willis was aware that it was Kennedy who accused him of sexual harassment.  *See* Dkt. 39-1 at 188 (Kennedy Dep. at 88:20–25); Dkt. 39-6 at 28–29 (Pl.'s SDMF ¶ 97).  A reasonable jury might read the email chain and O'Neal's "heads up" as suggesting that she too knew about Kennedy's allegations of sexual harassment and that she wanted to protect Willis in light of those allegations.  And, in any event, the email chain supports Kennedy's contentions (1) that Willis did not want her to return to the office of the administrator (where she was more likely to succeed), despite his claim—before seeing the email—that he would have

43

welcomed her back to replace Jensen, *see* Dkt. 42-1 at 78 (Def.'s Resp. to Pl.'s SDMF ¶ 166), and (2) that O'Neal supported Willis in this objective and wanted to maintain control over the FRA's assessment of Kennedy's performance through the PIP process, so that she could see to it that Kennedy was removed.  To be sure, there may be an entirely different explanation for why O'Neal was giving Willis a "heads up," but the Department has yet to offer one, and, in any event, a reasonable jury could draw the inferences that Kennedy proposes.

This theory finds some additional support in the testimony of the FRA's own contracting officer, Lee Anderson.  At deposition, he testified as follows:

> Q.  So, with respect to option number 3, we at least knew that Ms. O'Neal had concerns about that, given the fact that she's forwarding your e-mail to Mr. Willis, right?  You don't have to agree or disagree with that, but it seems like that's pretty logical, right, so that left basically only option 2, which is to keep her in RCFO and put her on a PIP, right?
>
> A.  Yes.
>
> Q.  And would you agree with me that if she's put on a PIP in which she's the person who is charged with evaluating her performance on the PIP and therefore, communicating that to you that, that would allow her to keep control of what happens to Ms. Kennedy as opposed to if she gets moved over to ROA?
>
> . . .
>
> A.    So, *I would have relied on the feedback from* [*O'Neal*] *regarding* [*Kennedy's*] *performance* as to whether or not she was making progress on the PIP, but I mean the measures are -- the qualifications are pretty straight forward,

right, like keep the calendar up to date, go and show up to work on time, et cetera, et cetera.

Q. Right, but Mr. Anderson, I'm asking you to put this all in context, right?

A. Sure.

Q. -- which is midway through the PIP, she's already drafting an e-mail saying, "Let's get rid of her.  We want her out.  She's not performing," right?

A. Yes.

Q. Then, on top of that, you're now being made aware of the fact that she's a subject of a retaliation complaint along with Mr. Willis who she's informing of the fact that you might want to move her to ROA.  So, wouldn't the fact that she now decides to let her get on this PIP, wouldn't that sort of clarify for you why there was this change of mind, because she could now control what happens with Ms. Kennedy – "Let's put her on a PIP and let's get rid of her?"

. . .

Q.  Based on everything, she was the subject of a retaliation complaint.  She's already telling you two weeks into a 30-day PIP, she wants her gone.  She's informing her alleged co-conspirator, who is also the subject of a retaliation complaint, that you might want to move her into ROA; isn't it possible that Ms. O'Neal's change of mind occurred because she realized that if she gets put on a PIP that she could control Ms. Kennedy's destiny by removing her after that 30-day PIP?

. . .

A.  Yultia doesn't have -- she wouldn't have unilateral authority to make that happen, so again, I keep going back to this, but it would be a team effort between,

I mean like everybody.  *So, does it appear suspicious, yes*.  Is that what actually occurred, I can't remember.

Q.  But even if she didn't have unilateral control, and that's not the point I wanted to make, *the point I wanted to make was that she could exercise substantial influence over . . . Kennedy's success on that PIP, right*?

. . .

A. *Yes*.

Q. *And she could also exercise substantial control the messaging that goes to you to substantiate her desire to get Ms. Kennedy removed from FRA as well*?

. . .

A. *Yes*.

Dkt. 39-1 at 1054–58 (Anderson Dep. at 183:12–187:8) (emphasis added).

Other evidence might further support this theory as well, including a Skype chat from Jensen to Kennedy, in which Jensen states that O'Neal and Willis "seem very close," Dkt. 39-1 at 1571 (Pl.'s Ex. 17), and undisputed evidence that O'Neal "was regularly in . . . Willis's office space for the purposes of discussing work related matters," Dkt. 42-1 at 53 (Def.'s response to Pl.'s SDMF ¶ 110).  The speed with which O'Neal moved to terminate Kennedy, moreover, at least arguably supports an inference of improper motive.  O'Neal was aware that Kennedy was dealing with a difficult pregnancy and that she was new to RCFO.  Yet, despite these obstacles, O'Neal almost immediately concluded that Kennedy was not up to the job, and she quickly moved to end Kennedy's relationship with the FRA.  The speed with which O'Neal acted caught Kennedy's Dynamic-Pro supervisor by surprise, promoting him to write to Anderson as follows:

> I would very much like to discuss this before moving forward.  Diamond has only been in her new role for 5 weeks, supporting a brand new office replacing someone who had been there for years.  This new role entails a high level of variance from her previous 2 roles in FRA where she first provided support to another Admin III in the Front Office, then provided support to one Senior FRA Employee for Government Affairs.  *During both of those previous roles, she*

> *received consistent accolades, with no issues with performance raised at any point. In fact, prior to her moving to RCFO you may recall the person she supported in Government Affairs was quite adamant that she not be removed from supporting him. I find it highly unlikely that in her ~9 months of supporting FRA without any issues and after a Senior member of FRA was quite upset to be losing her, she suddenly cannot perform to expectations.*

Dkt. 39-3 at 128 (Pl.'s Ex. 50) (emphasis added).

None of this, of course, conclusively establishes that O'Neal did, in fact, know about Kennedy's EEO protected activity, much less that she targeted Kennedy because of that activity. Nor has the Court endeavored to marshal the evidence that the Department has cited in support of its counternarrative. For present purposes, the Court merely concludes that Kennedy has offered sufficient evidence to survive the Department's motion for summary judgment on her claim of retaliatory removal/termination. The parties will have ample opportunity to present all of their evidence at trial, and it will be up to the jury to decide which version of events is the more convincing.

The Court will, accordingly, deny the Department's motion for summary judgment as to Kennedy's retaliatory removal/termination claim.

## C.     Failure to Accommodate Disability

Count III of Kennedy's complaint alleges that the FRA failed to accommodate her disability under the Rehabilitation Act, 29 U.S.C. § 701 *et seq.* 19-2666, Dkt. 1 at 18–20 (Compl. ¶¶ 74-84). As explained above, Kennedy became pregnant while working at the FRA and suffered from hyperemesis gravidarum, a severe form of morning sickness. Dkt. 39-1 at 178 (Pl.'s Ex. 4, Kennedy Dep. at 45:14–48:9). As an accommodation, she requested a desk closer to the bathroom and the ability to telework on days when her condition was particularly severe, as travel exacerbated her nausea. *Id.* (Pl.'s Ex. 4, Kennedy Dep. at 48:16–18). According to

Kennedy, she received neither accommodation before she was removed from the contract and terminated by Dynamic-Pro.  *Id.* at 179 (Pl.'s Ex. 4, Kennedy Dep. at 49:22–24)

The Department moves for summary judgment on Kennedy's failure to accommodate claim on two grounds:  First, it argues that Kennedy was not an otherwise qualified individual with a disability, and, second, it argues that she voluntarily abandoned the interactive process. Because neither argument is convincing, the Court will deny the Department's motion for summary judgment on Kennedy's failure to accommodate claim.

1.    *Kennedy's qualifications for the position*

"The Rehabilitation Act requires employers to provide 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the [employer's] business[.]'"  *Bonnette v. Shinseki*, 907 F. Supp. 2d 54, 77 (D.D.C. 2012) (alterations in original) (quoting 42 U.S.C. § 12112(b)(5)(A)). To demonstrate that her employer failed to provide a reasonable accommodation, a plaintiff must show that:  "(1) she has a disability within the meaning of the statute; (2) the defendant had notice of her disability; (3) she could perform the essential functions of the employment position with or without reasonable accommodation; and (4) the defendant refused to make the accommodation."  *Id.*  "If the plaintiff establishes a prima facie case of failure to provide reasonable accommodation, then it is up to the employer to demonstrate that the accommodation would have imposed an undue burden on its business," but "the ultimate burden . . . remains with the plaintiff."  *Id.*

For present purposes, the Department assumes that Kennedy's condition is a disability under the statute, Dkt. 32-1 at 42, and, absent any argument to the contrary, the Court will do

likewise.  Instead, the Department premises its attack on Kennedy's prima facie case on the

contention that she "was . . . not qualified for the Administrative Assistant II position in the CFO

Office," *id.*, because she lacked "'the requisite skill, experience, education, [or] other job-related

requirements'" for holding the position, *id.* (quoting 29 C.F.R. § 1630.2(m)), and because she did

"'not give notice of [her] need for [an] accommodations until after'" the problems with her

performance were raised, *id.* (quoting EEOC, *Applying Performance and Conduct Standards to*

*Employees with Disabilities* (Sept. 3, 2008), https://www.eeoc. gov/laws/guidance/applying-

performance-and-conduct-standards-employees-disabilities).

 "[T]o meet her burden of showing she was a 'qualified individual entitled to the

Rehabilitation Act's protections' at the time of her termination, [Kennedy] must show by a

preponderance of the evidence at trial that she was 'able to perform, with or without reasonable

accommodation, the essential functions of the employment position[.]'"  *Mitchell v. Pompeo*,

No. 1:15-CV-1849 (KBJ), 2019 WL 1440126, at *5 (D.D.C. Mar. 31, 2019) (second alteration in

original) (quoting *Solomon v. Vilsack*, 763 F.3d 1, 5 (D.C. Cir. 2014)).  This means that she must

have had the necessary skills and experience to "perform the essential functions of [the]

position," with or without the requested reasonable accommodation.  29 C.F.R. § 1630.2(m).

Reviewing the extensive record on summary judgment, the Court concludes that the

determination whether Kennedy was a qualified person is a question for the jury.  As detailed at

length above, there is evidence that Kennedy's performance was poor and that perhaps she was

not qualified to stay in her current role.  But Kennedy has offered competing evidence regarding

her qualifications and competency, including positive reviews from others at the FRA, as

reported by her supervisor at Dynamic-Pro.  Perez noted in a November 2017 email to Kennedy,

for example, that "we heard great things about you[] from the Small Business Specialist as well,

so it appears you are making wave[s] at FRA!"  Dkt. 39-1 at 1160 (Pl.'s Ex. 10).  The next

month, the FRA contracting officer at the time, Polkiewicez, forwarded to Perez feedback

indicating that Kennedy, among others, was "very professional and produce[d] good work."

Dkt. 39-2 at 639.  Hess testified at deposition that he did not have "any particular issues with

[Kennedy's] performance."  Dkt. 39-1 at 1197 (Hess. Dep. at 36:5–13).  And in response to

Anderson's August 23 email indicating that the FRA hoped to replace Kennedy, Perez observed

that, "[d]uring both of [her] previous roles [at the FRA], she received consistent accolades, with

no issues with performance raised at any point."  Dkt. 39-3 at 128 (Pl.'s Ex. 50).  This and other

evidence is sufficient to create a genuine issue of material fact as to whether Kennedy was a

qualified person entitled to Rehabilitation Act protections.

Beyond that, one of the most significant performance problems identified by the

Department—Kennedy's tardiness—could have been resolved (or substantially mitigated)

through a reasonable accommodation, such as allowing her to sit at a desk closer to the bathroom

or permitting intermittent telework.  *See* Dkt. 39 at 61.  As the EEOC has explained, "[i]f a

reasonable accommodation is needed to assist an employee in addressing a performance

problem, and the employer refuses to provide one, absent undue hardship, the employer has

violated the ADA."  EEOC, *Applying Performance and Conduct Standards to Employees with

Disabilities*, *supra*; *see also Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 143 (2d Cir.

1995) ("Failure to consider the possibility of reasonable accommodation for such disabilities, if it

leads to discharge for performance inadequacies resulting from the disabilities, amounts to a

discharge solely because of the disabilities.").  Thus, to the extent that the Department viewed

Kennedy as unqualified because of her frequent bathroom trips or tardiness in the morning, the

Department's failure to offer reasonable accommodations to resolve those performance issues

may itself constitute disability discrimination.

      2.     *Interactive process*

The Rehabilitation Act does not require "[e]mployers [to] give employees the exact

accommodations they request." *Spector v. District of Columbia*, No. 1:17-CV-01884 (CJN),

2020 WL 977983, at *6 (D.D.C. Feb. 28, 2020). The law does, however, require that the parties

engage in a constructive dialogue in order to find an accommodation, and that dialogue requires

the exchange of "information about the nature of the individual's disability and the desired

accommodation—information typically possessed only by the individual or her physician."

*Ward v. McDonald*, 762 F.3d 24, 31 (D.C. Cir. 2014). The required back-and-forth between the

employer and the employee that is necessary to identify an appropriate, reasonable

accommodation is called the "interactive process." *Id.* at 32; *see also Ali v. Pruitt*, 727 F. App'x

692, 695 (D.C. Cir. 2018). The interactive process requires "'a flexible give-and-take' between

employer and employee 'so that together they can determine what accommodation would enable

the employee to continue working.'" *Ward*, 762 F.3d at 32 (quoting *EEOC v. Sears, Roebuck &*

*Co.*, 417 F.3d 789, 805 (7th Cir. 2005)).

      The governing regulations reflect this requirement:

> To determine the appropriate reasonable accommodation[,] it may be necessary
> for the [employer] to initiate an informal, interactive process with the individual
> with a disability in need of the accommodation. This process should identify
> the precise limitations resulting from the disability and potential reasonable
> accommodations that could overcome those limitations.

29 C.F.R. § 1630.2(o)(3). Importantly, "'[n]either party should be able to cause a breakdown in

the process for the purpose of either avoiding or inflicting liability.'" *Ward*, 762 F.3d at 32

(quoting *Sears*, 417 F.3d at 805). Courts therefore ask whether one of the parties declined to

participate in the process in good faith.  *Id.*  "A party that obstructs or delays the interactive

process," for example, "is not acting in good faith," nor, generally, is "[a] party that fails to

communicate, by way of initiation or response."  *Id.* (quoting *Sears*, 417 F.3d at 805).

Viewing the facts in the light most favorable to Kennedy, as the Court must at this stage

of the proceeding, a reasonable jury could find that it was the Department—and not Kennedy—

that ended the interactive process or failed to participate in that process in good faith.  There is

evidence, for example, indicating that at least seven desks were open and available near the

women's bathroom.  Dkt. 39-1 at 179 (Pl.'s Ex. 4, Kennedy Dep. at 50:1–6).  Yet, despite

requesting that accommodation on September 5, 2018, Kennedy was not relocated as of her

termination on October 1, raising some question about the FRA's good faith efforts to find and

promptly to implement a reasonable accommodation.  *See* Dkt. 39-6 at 52, 79 (Pl.'s SDMF

¶¶ 179–80, 282); Dkt. 42-1 at 83–84, 128 (Def.'s Response ¶¶ 179–80, 282).  When that delay is

situated amongst the other evidence that could support a finding that O'Neal wanted to remove

Kennedy, regardless of whether she spent too much time away from her desk, it takes on greater

force.  And it takes on still greater force in light of the Department's arguably anemic response:

that it had to jump through various bureaucratic hoops merely to move O'Neal's desk.  Dkt. 42 at

27 ("[T]he issue of relocating Plaintiff's desk was not as straight-forward as Plaintiff believed it

to be").

A reasonable jury could also find that certain FRA communications suggest that the

agency was not engaged in good faith in the interactive process.  Just minutes after Perez sent an

email to Whiting, O'Neal, and Noah seeking to discuss the interactive process, for example,

O'Neal responded that "[u]nfortunately, [Kennedy] will not be permitted to telework in lieu of

sick leave.  If she is not feeling well, [Kennedy] will need to request sick or personal leave from

DPI." Dkt. 39-4 at 201–02 (Pl.'s Ex. 73).  A reasonable jury could also find that the Department's counter-proposal—requiring Dynamic-Pro to have another person in the office on days Kennedy teleworked—was not made in good faith.  *See* Dkt. 39 at 67–68.  O'Neal wrote, "[a]s an alternative accommodation, FRA is willing to have another person work in the office on the days [Kennedy] is teleworking if DPI can *guarantee* that the individual is qualified as a[n] Admin Support II."  Dkt. 39-4 at 255–56 (Pl.'s Ex. 78).  It is far from clear that O'Neal reasonably believed that Dynamic-Pro could feasibly pay two individuals to perform the work of one employee, merely to avoid permitting one employee to telework two to three times a week.  *See, e.g.*, Dkt. 39-1 at 528–30 (Perez Dep. 243:2–245:1) (explaining that this was not "a feasible alternative accommodation in [his] mind" because DPI "would essentially have to have people go through the clearance process, but not actually be on the [c]ontract and waiting"); Dkt. 39-2 at 785 (Whiting Dep. 132:6–12).

In arguing that it was Kennedy who abandoned the interactive process, the Department focuses on one email she sent.  On September 28, 2018, Perez emailed Kennedy about the progress of her accommodations request and, as to the telework request, wrote, "Please let me know if you would like to continue the interactive dialogue on your 2nd request, if so we can arrange time to speak to move the process forward on other potential options."  Dkt. 39-4 at 270 (Pl.'s Ex. 80).  Kennedy responded that day, "So overall nothing was accomplished in this week and [a] half to two weeks of my request."  *Id.*  In the Department's view, this email ended the interactive process.  But the Department ignores Kennedy's other email to Perez that same day affirming, "I want you to also understand I am flexible and willing to work out a way on my end as well," and offering a possible counterproposal.  *Id.*; *see also* Dkt. 42 at 27 (admitting that "the Secretary acknowledges that he overlooked this email in its review of discovery").  In other

words, she expressed a desire to continue the interactive process, which the FRA arguably ignored.

For all these reasons, the Court concludes that there is a genuine issue of material fact as to whether Kennedy abandoned the interactive process or whether, instead, the Department failed to engage in good faith back-and-forth, effectively denying her accommodations request.  The Court, accordingly, will deny the Department's motion for summary judgment as to Count III.

## CONCLUSION

For the foregoing reasons, the Department's motion for summary judgment, Dkt. 32, is hereby **GRANTED** in part and **DENIED** in part.  The motion is **GRANTED** with respect to Kennedy's claim of a hostile work environment based on gender (Count I), and her claim of a retaliatory hostile work environment (a portion of Count II), but it is **DENIED** with respect to her retaliatory removal/termination claim (the other portion of Count II) and her claim that the Department failed to accommodate her disability (Count III).

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  March 17, 2023

54